**Johnny Paul PENRY, Appellant,**

v.

**The STATE of Texas.**

No. AP–74445.

Court of Criminal Appeals of Texas.

Oct. 5, 2005.

Rehearing Denied Dec. 14, 2005.

Gary A. Taylor, Austin, for Appellant.

WIlliam Lee Hon, Asst. Criminal District Atty., Livingston, Matthew Paul, State's Atty., Austin, for State of Texas.

## OPINION

PRICE, J., delivered the opinion of the Court, in which MEYERS, WOMACK, JOHNSON, and HOLCOMB, JJ., joined.

The appellant was convicted of capital murder. His sentence was reversed twice by the United States Supreme Court because the jury instructions failed to provide an adequate vehicle to give effect to the appellant's evidence of mental retardation. During the most recent retrial, the trial court submitted instructions and a mitigation special issue that asked the jury to decide whether the appellant is mentally retarded, and if not, to "consider whether any other mitigating circumstance or circumstances exist as defined herein."

In his fifteenth point of error, the appellant complains that the instruction, as given, precluded the jury's giving effect to the appellant's evidence of mental impairment that might not amount to mental retardation. Because we conclude that there is a

reasonable likelihood that the jury was precluded from considering this circumstance as mitigating outside of showing mental retardation, we will reverse and remand for a new trial on punishment.

## I. Procedural History

The appellant was convicted of the 1979 capital murder of Pamela Carpenter and sentenced to death. We affirmed the conviction and sentence.[1] The United States Supreme Court reversed the appellant's sentence on the basis that the jury was not provided with a vehicle for expressing its reasoned moral response to the appellant's mitigating evidence in rendering its sentencing decision.[2] On retrial, the appellant was convicted and sentenced to death again.[3] We affirmed the appellant's second conviction and sentence.[4] The United States Supreme Court then reversed the appellant's sentence on the basis that the trial court's nullification instruction was internally inconsistent and still did not provide the jury with a vehicle to give effect to its reasoned moral response to the appellant's mitigating evidence.[5]

The appellant was retried on punishment only, and, pursuant to the jury's answers to the special issues, the trial court again sentenced the appellant to death.

## II. Relevant Facts

After hearing evidence about the appellant's mental impairment, childhood abuse, home life, educational background, and the circumstances of the offense, the jury in this case was instructed to consider four special issues.[6] The trial court submitted the first three special issues in accordance with Code of Criminal Procedure Article 37.0711.[7] In the first special issue, the jury was asked whether the appellant acted deliberately when he caused the victim's death. In the second special issue, the jury was asked whether there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. In the third special issue, the jury was asked whether the appellant's conduct in killing the victim was unreasonable in response to provocation, if any, by the victim. The jury answered these three issues yes.

The trial court submitted the current statutory mitigation issue from Article 37.0711 as the fourth special issue.[8] In the fourth special issue, the jury was asked whether, taking into consideration all the evidence, including the circumstances of the offense, the appellant's character and background, and the personal moral culpability of the appellant, there is a sufficient mitigating circumstance or circumstances to warrant a life sentence instead of death.

---

**1.** *Penry v. State,* 691 S.W.2d 636 (1985).

**2.** *Penry v. Lynaugh,* 492 U.S. 302, 328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (*Penry I*).

**3.** Before September 1, 1991, in capital murder cases that were reversed on the basis of error during punishment only, the cases were remanded for a new trial on guilt *and* punishment. The legislature amended Code of Criminal Procedure Article 44.29 in 1991 to provide for a remand on punishment only when reversible error occurred during punishment. Act of May 17, 1991, 72nd Leg.,

R.S., ch. 838, § 2, 1991 Tex. Gen. Laws 2898, 2900.

**4.** *Penry v. State,* 903 S.W.2d 715 (1995).

**5.** *Penry v. Johnson,* 532 U.S. 782, 804, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) (*Penry II*).

**6.** A copy of the instructions and special issues that were read to the jury is attached as an appendix.

**7.** *See* TEX.CODE CRIM. PROC. Art. 37.0711, § 3(b).

**8.** *See* TEX.CODE CRIM. PROC Art. 37.0711, § 3(e).

In its instructions regarding the fourth special issue, the trial court told the jury that neither party had the burden of proof on the fourth special issue and that the jury should "consider mitigating evidence, if any, that a juror might regard as reducing the [appellant's] moral blameworthiness." The trial court then told the jury that mental retardation is a mitigating factor as a matter of law, and it defined mental retardation. The jury was instructed that, if it believed that the appellant is mentally retarded, it should answer the fourth special issue yes. If the jury found that the appellant was not mentally retarded, the jury was instructed to "follow the Court's instructions previously given herein concerning the appropriate answer to Special Issue No. 4 and consider whether *any other* mitigating circumstance or circumstances exist as defined herein." [9]

The appellant made several objections to the jury charge, including an objection that, if the jury concluded that the appellant was not mentally retarded, the jury could then consider as mitigating evidence only circumstances other than mental impairment and mental deficiencies.

The trial court overruled the appellant's objection. During its deliberations, the jury answered the fourth special issue no.

### III. Parties' Arguments

■ The appellant complains that the jury was foreclosed from considering his evidence of mental impairment that did not establish mental retardation. The jury was instructed, if it found that the appellant was not mentally retarded, to "consider whether any other mitigating circum-

stance or circumstances exist as defined herein." He argues that this specific language created a reasonable likelihood that the jury applied the instruction in such a way that prevented the appropriate consideration of the appellant's constitutionally relevant mitigating evidence of mental impairment that did not rise to the level of establishing mental retardation.

The State argues that the statutory definition of mitigating evidence, when read in tandem with the instruction to consider all evidence when deciding whether sufficient mitigating circumstances exist to warrant a life sentence, was sufficient. For this proposition, the State cites *Shannon v. State*,[10] in which we held that the statutory definition of mitigating evidence as laid out in Code of Criminal Procedure Article 37.071 does not unconstitutionally narrow a jury's consideration of mitigating evidence. But *Shannon* deals with the special issues generally and not the specific facts of this case.

### IV. Law and Analysis

■ A jury in a capital case must be given a vehicle to give effect to the appellant's constitutionally relevant mitigating evidence.[11] The states have discretion to structure the jury's consideration of mitigating evidence, but it "may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." [12]

■ A capital defendant cannot establish a constitutional violation simply by

---

9. Emphasis added.

10. 942 S.W.2d 591, 597 (Tex.Crim.App.1996).

11. *Penry I*, 492 U.S. at 328, 109 S.Ct. 2934.

12. *Johnson v. Texas*, 509 U.S. 350, 362, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990) (Kennedy, J., concurring)).

demonstrating that an allegedly erroneous jury instruction could have or might have affected some hypothetical jury.. The Supreme Court explained in *Boyde v. California* that a defendant must show that

> there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction.... Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.[13]

In *Boyde*, the Supreme Court considered whether California's "unadorned" mitigating factor (k) permitted the jury to give effect to the defendant's evidence of his background and character.[14] This mitigating factor asked California juries to determine whether "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."[15] Applying the standard above to the unadorned factor, the Supreme Court held that the defendant

**13.** *Boyde v. California*, 494 U.S. 370, 380–81, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

**14.** The trial court in *Boyde* submitted the following instruction to the jury:

> In determining which penalty is to be imposed on [each] defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, [except as you may be hereafter instructed]. You shall consider, take into account and be guided by the following factors, if applicable:
> (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.
> (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.
> (c) The presence or absence of any prior felony conviction.
> (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.
> (e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.
> (f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.
> (g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.
> (h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the affects of intoxication.
> (i) The age of the defendant at the time of the crime.
> (j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.
> (k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

*Id. at* 373 n. 1, 110 S.Ct. 1190.

**15.** *Id.* at 375, 110 S.Ct. 1190.

had an opportunity through factor (k) to argue that his background and character "extenuated" or "excused" the seriousness of the crime, and we see no reason to believe that reasonable jurors would resist the view, "long held by society," that in an appropriate case such evidence would counsel imposition of a sentence less than death. The instruction did not, as petitioner seems to suggest, limit the jury's consideration to "any other circumstance of the crime which extenuates the gravity of the crime." The jury was directed to consider any other circumstance that might excuse the crime, which certainly includes a defendant's background and character.[16]

At first glance, factor (k) in *Boyde* seems very similar to the instruction given in the appellant's case. Here, the jury was instructed to consider any other mitigating circumstance or circumstances when answering the fourth special issue after determining that the appellant was not mentally retarded. This situation is different from *Boyde* because the instruction to consider "any other circumstance or circumstances" excludes what the jury had already considered: mental impairment that did not rise to the level of mental retardation. This circumstance, even if the jury concluded that the appellant is not mentally retarded, is the kind of double-edged circumstance that the jury should be able to consider within the context of the mitigation special issue.[17]

The parties' arguments to the jury did not clear up this confusion. The State told the jury

"If you don't believe he's mentally retarded, your job is not complete on that fourth special issue. As we discussed, you still have to look at the *other evi-*

*dence* in this case and decide whether there are *any other kinds of evidence* in this case there that you believe reduces this man's moral culpability for commission of these crimes, whether it's child abuse, mental illness, whatever."

In the context of victim-impact evidence, the State told the jury, "And that's important to that mitigation question, because that mitigation question asks you to consider all the evidence and it also asks you to consider the circumstances of the offense and the character of the Defendant."

Defense counsel came close to explaining how the jury should consider the evidence, but in light of the trial court's instructions and the State's argument, this is not sufficient to correct the problem.

But we also suggest to you, respectfully, that there are mitigating circumstances in this case that reduce his moral blameworthiness. His mental deficiencies, call it whatever you want, mental retardation, borderline, everyone agrees, even the State's witnesses, this is a very slow man. His brain simply does not work the way yours and mine do.

The parties' arguments did not explicitly inform the jury that it should reconsider the appellant's mental impairment when considering the fourth special issue if it concluded that the appellant was not mentally retarded.

Because there is a reasonable likelihood that the jury believed that it could not give effect to mental impairment, outside of tending to show that the appellant is mentally retarded, the trial court erred in instructing the jury to "consider whether any other mitigating circumstance or circumstances exist as defined herein."

16. *Id.* at 382, 110 S.Ct. 1190.

17. *See Penry I,* 492 U.S. at 328, 109 S.Ct. 2934.

We appreciate that the trial court had once again found itself in a difficult position. During this trial, the Supreme Court handed down its opinion in *Atkins v. Virginia*,[18] holding that executing people who are mentally retarded violates the Eighth Amendment to the United States Constitution. The legislature has not modified the statutory special issues within Articles 37.071 and 37.0711 to include a special issue on mental retardation. The trial court might have believed that it was not permitted to submit a separate special issue solely on mental retardation.[19]

Although we may have sympathy for the trial court's position, we conclude that there is a reasonable likelihood that the jury believed that it was not permitted to consider mental impairment outside of determining whether the appellant is mentally retarded. As a result, the instructions in this case fell short of the constitutional requirement that the jury be provided a vehicle to give effect to its reasoned moral response to the appellant's mitigating circumstances.

## V. Harm Analysis

Under Code of Criminal Procedure Article 36.19, we will not reverse a conviction or sentence on the basis of jury charge error "unless the error appearing from the record was calculated to injure the rights of the defendant, or unless it appears that the defendant has not had a fair and impartial trial."[20] In *Almanza v. State*, we have concluded that this language created two separate harm-analysis standards: the

first to be used when a timely objection is made to the charge; the second to be used when no such objection appears in the record.[21]

The first standard dictates that reversal should occur if the defendant made a timely objection and if the error is "calculated to injure the rights of the defendant." We have interpreted this to mean that there must be some harm to the defendant from the error.[22] Properly preserved jury-charge error requires reversal unless it is harmless.

If the defendant has not made a timely objection, we apply the second standard, and reversal is not required unless he has not had a fair trial.[23]

The appellant in this case did make a timely objection to the charge, so we will apply the first standard and reverse unless the error is harmless. Because we have already concluded that there is a reasonable likelihood that the jury believed that it was not permitted to consider evidence of mental impairment outside of determining whether the appellant is mentally retarded, we cannot conclude that the error was harmless. As a result, the error is reversible.

## VI. Conclusion

We conclude that the trial court erred in instructing the jury on the mitigation special issue and that the error was not harm-

---

**18.** 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

**19.** *But see State v. McPherson*, 851 S.W.2d 846, 849–50 (Tex.Crim.App.1992) (noting that this Court had "grappled with the application of *Penry*" for some time; upholding the submission of an extra-statutory special mitigation issue).

**20.** Tex.Code Crim. Proc. Art. 36.19.

**21.** *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984) (op. on reh'g).

**22.** *Ibid.*

**23.** *Ibid.*

less. We reverse the appellant's sentence and remand for a new punishment trial.[24]

KELLER, P.J., filed a dissenting opinion in which COCHRAN, J., joined.

COCHRAN, J., filed a dissenting opinion, in which KELLER, P.J., and KEASLER and HERVEY, JJ., joined.

### Appendix

This is cause No. 10,222, the State of Texas versus Johnny Paul Penry. In the District Court of Polk County Texas, 258th Judicial District.

Charge of the Court.

Members of the jury, the Defendant, Johnny Paul Penry, has previously been found guilty of the offense of the capital murder of Pamela Carpenter, which was committed by him on or about October 25, 1979, in Polk County, Texas. It is necessary now for you to determine from all the evidence in the case the answers to certain questions called Special Issues in this Charge. The Court instructs you further, however, as follows.

Roman Numeral One, range of punishment. The mandatory punishment for capital murder is death or confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

Roman Numeral Two, consideration of evidence. In determining the answer to the Special Issues you shall consider all of the evidence submitted to you in this trial. Further, you shall consider all evidence submitted to you during the trial as to the character or background of the Defendant or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty.

You are instructed that when you deliberate on the Special Issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in the trial. A mitigating circumstance may include, but is not limited to, any aspect of the Defendant's character, background, or circumstances of the crime which you believe could make a death sentence inappropriate in this case, if any. If you find that there are mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter give effect to them in assessing the defendant's personal culpability at the time you answer the Special Issues.

Roman Numeral Three, Special Issues Number 1, 2 and 3. The Jury is instructed to return a special verdict of "yes" or "no" to Special Issues No. 1, No. 2, and No. 3.

The word "deliberately," as used in Special Issue No. 1, means a manner of doing an act characterized by or resulting from careful consideration, a conscious decision involving a thought process which embraces more than mere will to engage in the conduct.

The burden of proof as to Special Issue No. 1, No. 2 and No. 3, rests upon the State and never shifts to the Defendant. The State must prove beyond a reasonable doubt that the answers to each of these Special Issues should be "yes." However, it is not required that the State prove an affirmative answer to these issues beyond all doubt. It is required that the State's proof excludes all reasonable doubt concerning an affirmative answer to each of these three issues. In the event you have a reasonable doubt as to an affirmative answer to one or more of these after considering all of the evidence before you and

---

24. Because we have reversed the appellant's sentence on the basis of his fifteenth point of error, we need not address the appellant's other nineteen points of error.

these instructions, you will answer the issue or issues "no."

You are therefore instructed that you may not answer Special Issue No. 1, No. 2 or No. 3 "yes" unless all jurors unanimously agree beyond a reasonable doubt. Further, you may not answer any of these three special issues "no" unless ten or more jurors agree.

Roman Numeral Four, Special Issue No. 4. You are further instructed that if the jury answers Special Issue No. 1, No. 2, and No. 3 "yes" then, and only then, the jury shall answer Special Issue No. 4. The jury will answer Special Issue No. 4 either "yes" or "no." There is no burden of proof upon the State or the Defendant regarding Special Issue No. 4. The jury shall consider mitigating evidence, if any, that a juror might regard as reducing the Defendant's moral blameworthiness.

You are instructed that mental retardation is a mitigating factor as a matter of law. Mental retardation is defined as, (A), significantly subaverage intellectual functioning, an IQ of approximately 70 or below on an individually administered IQ test; (B), concurrent deficits or impairments in present adaptive functioning, i.e., the person's effectiveness in meeting the standards expected for his or her age by his or her cultural group in at least two of the following areas: Communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety; and (C), the onset is before 18 years.

Therefore, you are instructed that if you believe from all the evidence that the Defendant is a person with mental retardation, then you are instructed to answer Special Issue No. 4 "yes." However, if you do not believe from all the evidence that the person is—that the Defendant is a person with mental retardation, then you shall follow the Court's instructions previously given herein concerning the appropriate answer to Special Issue No. 4 and consider whether any other mitigating circumstance or circumstances exist as defined herein.

The jury may not answer Special Issue No. 4 "no" unless all jurors agree unanimously. The jury may not answer "yes" to this issue unless ten or more jurors agree.

Roman Numeral Five, effect of answers to Special Issues. You are instructed that if you answer Special Issues No. 1, No. 2, and No. 3 "yes," and you answer Special issue No. 4 "no," then the Court shall sentence the Defendant to death.

You are further instructed that if you answer Special Issues No. 1, No. 2, No. 3 and No. 4 "yes," then the Court shall sentence the defendant to confinement in the Institutional Division of the Texas Department of Criminal Justice for life.

Furthermore, you are instructed that if you answer Special Issues No. 1, No. 2, No. 3 in the negative, that is, an answer of "no" to one or more of these issues, then the Court shall sentence the defendant to confinement in the Institutional Division for the Texas Department of Criminal Justice for life.

Roman Numeral Six, special instructions. During your deliberations you are not to consider nor discuss any possible action of the Board of Pardons and Paroles division of the Texas Department of Criminal Justice or the Governor or how long a Defendant will be required to serve to satisfy a sentence of life imprisonment.

You are further instructed that you are not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

You are instructed that a Defendant may testify in his own behalf if he chooses to do so. This, however, is a privilege accorded to the Defendant, and in the event he elects not to do so, that fact will not be taken by you as a circumstance against him nor prejudice him in any way. In this case the Defendant has elected not to testify and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations nor take it into consideration for any purpose whatsoever as a circumstance against the Defendant.

Your are further instructed that if there is any evidence before you in this case regarding the Defendant having committed an offense or offenses, if any, other than the offense for which he has been convicted, to-wit, the capital murder of Pamela Carpenter, you cannot consider this evidence for any purpose unless you find and believe there is clear proof that the Defendant committed such other offense or offenses, if any were committed, and even then you may only consider the same in determining the answers to the Special Issues.

Your are instructed that if you heard testimony from expert witnesses that was not supported by the evidence admitted before you during the course of this trial, those facts shall only be considered for the purpose of explanation or support for any such expert's opinions or conclusions and they shall not be considered for the truth of the matter asserted.

You are the exclusive judges of the facts proved, of the credibility of the witnesses and the weight to be given their testimony. But it is the law you shall receive in these written instructions and you will be governed thereby.

Occasionally during jury deliberations a dispute arises as to the testimony presented. If this should occur in this case, you shall inform the Court and request that the Court read the portion of the disputed testimony to you from the official transcript.

Roman Numeral Seven. After you retire to the jury room, you shall select one of your members as your foreperson. It is his or her duty to deliberate—to preside at your deliberations, vote with you, and to certify to your verdict by using the appropriate forms included herein, and signing the same as foreperson.

No one has any authority to communicate with you except the officer who has you in charge. During your deliberations in this case, you must not consider, discuss, nor relate any matters not in evidence before you. You should not consider nor mention any personal knowledge or information that you may have about any person or fact connected with this case which is not shown by the evidence before you.

It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

After you have retired, you may communicate with this Court in writing through the officer who has you in charge. Do not attempt to talk to the officer who has you in charge, or the attorneys or the Court, or

anyone else concerning any questions you may have. Following the arguments of the counsel, you will retire to consider your verdict.

Verdict form, Special Issues. Special Issue verdict forms. The Special Issues, with forms for your answers are as follows: Special Issue No. 1: Was the conduct of the Defendant, Johnny Paul Penry, that caused the death of Pamela Carpenter, the deceased, committed deliberately and with the reasonable expectation that the death of the deceased would result? Answer: We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "yes." An a line provided for the foreperson to sign. Or, we, the jury, because at least ten jurors have a reasonable doubt as to the matters inquired about in this Special Issue, find and determine that the answer to this Special Issue is "no." And a line provided for the foreperson to sign.

Special Issue No. 2: Is there a probability that the Defendant, Johnny Paul Penry, would commit criminal acts of violence that would constitute a continuing threat to society? Answer: We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "yes." And a line provided for the foreperson to sign. Or, we, the jury, because at least ten jurors have a reasonable doubt as to the matter inquired by in this Special Issue, find and determine that the answer to this Special Issue is "no." And a line provided for the presiding juror to sign.

Special Issue No. 3: Was the conduct of the Defendant, Johnny Paul Penry, in killing Pamela Carpenter, the deceased, unreasonable in response to provocation, if any, by the deceased? Answer: We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "yes." And a line provided for the foreperson to sign. Or, we, the jury, because at least ten jurors have a reasonable doubt as to the matters inquired about in this Special Issue, find and determine that the answer to this Special Issue is "no." And a line provided for the foreperson to sign.

In the event that the jury has answered Special Issue No. 1, Special Issue No. 2 and Special Issue No. 3 in the affirmative, then, and only then, does the jury answer Special Issue No. 3 that follows. Special Issue No. 4: Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense the Defendant's character and background, and the personal moral culpability of the Defendant, Johnny Paul Penry, that these is a sufficient mitigating circumstance or circumstances to warrant that a life—that a sentence of life imprisonment rather than a death sentence be imposed. Answer: We, the jury, unanimously find that the answer to this Special Issue is "no." And a line provided for the foreperson to sign. Or, we, the jury, find because at least ten jurors find that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed, find that the answer to this Special Issue is "yes." And a line provided for the foreperson to sign.

After this jury has answered each of the Special Issues under the conditions and instructions outlined above, the foreperson shall sign the verdict for below.

Verdict: We, the jury, return in open Court the above answers to the Special Issues submitted to us, and the same is our verdict in this case. And a line provided for the foreperson to sign.

KELLER, P.J., filed a dissenting opinion in which COCHRAN, J., joined.

In this case, the mitigation special issue submitted to the jury tracked the language of the statute. That statutory issue broadly encompasses any mitigating circumstance that might reduce a defendant's moral blameworthiness—including low intelligence that does not sink to the level of mental retardation. The trial court's instructions concerning the special issue did not suggest otherwise. With regard to the question before us, those instructions simply apprised the jury of two things. First, the instructions informed the jury that mental retardation automatically satisfied the requirements of the mitigation special issue. Second, the instructions informed the jury that, if mental retardation were not found, the jury should consider any other circumstance the jury believed reduced a defendant's moral blameworthiness and give it whatever weight the jury deemed appropriate. Low intelligence that does not sink to the level of mental retardation is a circumstance other than mental retardation. Under the trial court's instructions, the jury could have, but was not required to, decide that this circumstance had mitigating value sufficient by itself, or in combination with other factors, to warrant the imposition of a life sentence rather than the death penalty.

The trial court's instructions did not misstate the law (statutory or constitutional), and the Court does not seem to suggest otherwise. Rather, the Court indicates that the instructions were ambiguous in a way that was reasonably likely to have misled the jury into believing something inconsistent with the requirements established in *Penry I*[1] and its progeny. In support of this contention, the Court cites and discusses *Boyde v. California*[2] for the proposition that an ambiguous instruction deprives a defendant of his constitutional rights if there exists a reasonable likelihood that the jury applied the instruction in a constitutionally impermissible manner.[3]

I find a particular passage in that opinion to be relevant here, and while it is included in one of the Court's quotations, I believe the Court has failed to apprehend its significance to the case at bar:

Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in light of all that has taken place at the trial likely to prevail over technical hairsplitting.[4]

Most people understand differences in degree and the impact that such differences have on whether a certain action is mandatory or subject to discretion. When an instruction says that mental retardation is *automatically* mitigating but other circumstances can, in the jury's discretion, be considered mitigating, common sense suggests that other circumstances would include intelligence deficits that are less severe than mental retardation.

The Court interprets the instruction to consider "other" circumstances as directing the jury away from the matter of intelligence altogether. The Court does so by concluding that the jurors would reason that "other" circumstances exclude

1. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

2. 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

3. *See id.* at 380, 110 S.Ct. 1190.

4. *Id.* at 380–381, 110 S.Ct. 1190.

those based on the same evidence as a circumstance they have already considered. But the Court's approach tends to confuse "circumstances" with "evidence." Those two terms are not the same and there is no reasonable likelihood that the jurors would equate them. The fact is that the charge instructed the jury to consider *all* the evidence in determining the issue of mental retardation. If the jury followed that instruction and then, in accordance with the reasoning attributed to it by the Court, excluded circumstances based upon the same evidence, then it would necessarily exclude *all* circumstances, regardless of whether those circumstances related to intelligence, as it had already been instructed to consider *all* the evidence in connection with its earlier mental retardation determination. Obviously, the jury can be expected to understand that it may well be called upon to consider a particular item of evidence at multiple points in its deliberations. That understanding is surely buttressed by the fact that charge instructed the jury to consider all the evidence in connection with all the special issues. ·

The Court may be suggesting that the "other circumstances" language would lead the jury to look for the evidence that was predominantly relevant to the issue of mental retardation and exclude consideration of other issues to which that same evidence was predominantly relevant. Or perhaps the Court is suggesting that the jurors would look to the nature of the issue and decide that various intelligence issues were all similar enough to constitute a single "circumstance" to be considered solely within the umbrella of the mental retardation inquiry. However, those types of suggestions attribute to the jury a willingness to engage in technical and hair-

splitting distinctions based upon the most fragile grammatical foundations. As the Supreme Court has explained,[5] such conduct by the jury is not reasonably likely to have occurred.

I think the trial court's instruction reasonably conveyed to the jury that a finding of mental retardation required an automatic "yes" answer to the mitigation special issue but that other circumstances, including low intelligence that did not qualify as mental retardation, were available for consideration. I would reference another passage in the *Boyde* opinion that seems especially appropriate for the case at bar: "There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation."[6] Appellant has already been sentenced to death three times in the same case, and the third time, it is abundantly clear that the trial court made every effort to scrupulously comply with all of the Supreme Court's pronouncements. The Court's reversal, sending the case for a *fourth* punishment hearing, is based upon speculation that the jury might have read something into the charge that is not there.

I respectfully dissent.

COCHRAN, J., filed a dissenting opinion in which KELLER, P.J., KEASLER, and HERVEY, JJ., joined.

I join Presiding Judge Keller's dissenting opinion because I do not think that there is a reasonable probability that the jury in this particular trial, given this specific evidence and these advocates' excellent closing arguments, "applied the chal-

---

**5.** *See* footnote 4, *supra.*

**6.** 494 U.S. at 380, 110 S.Ct. 1190.

lenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[1]

The jurors certainly could have done so, but I cannot conclude that they would have done so or actually did do so. And it is this distinction between "could," "would," and "did" that is at the heart of the Supreme Court's discussion in *Boyde*.[2] There is a possibility that the jury felt itself precluded from considering appellant's evidence of mental slowness as being among the "other" circumstances that would mitigate his moral culpability. But *Boyde* requires the showing of "a reasonable likelihood" that the jury felt so restrained.[3] We are confronted with a claim that a jury instruction, though not erroneous, is sufficiently ambiguous to be "subject to an erroneous interpretation."[4] To evaluate this instruction, we should not engage in a technical parsing of its language; instead, we must "approach the instructions in that same way that the jury would—with a 'common-sense understanding of the instructions in the light of all that has taken place at the trial.'"[5] Thus, we must look beyond the four corners of the jury instructions themselves to the content and conduct of the trial.

This jury was selected solely to answer the special punishment issues in a death penalty case. The jury heard more than fifty witnesses during the course of the four week trial. The primary focus of that trial was the character and conduct of Johnny Paul Penry throughout his life.

The State presented one vision and version of him: he was a bad seed who sprouted into a poisonous apple. He was not, according to the State's witnesses, mentally retarded or mentally defective. He was a "slow learner" because he did not want to learn. He had a "difficult childhood" and was raised by an imperfect mother who was mentally ill. But, according to the State, "she also had a very

1. *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990).

2. *Id.* at 379–80, 110 S.Ct. 1190. The Supreme Court forthrightly admitted that "[t]he legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is less than clear from our cases." *Id.* at 378, 110 S.Ct. 1190. The Court stated that in one case it had said that "[t]he question ... is ... what a reasonable juror *could have understood* the charge as meaning." *Id.* (citation omitted). But in another case it had referred to both what a reasonable juror *"could"* have done and what he *"would"* have done. *Id.* at 379, 110 S.Ct. 1190 (citation omitted). In still another case, the Court phrased the matter as whether it is probable that "reasonable men might derive a meaning from the instructions given other than the proper meaning." *Id.* (citation omitted). In *Boyde*, the Supreme Court concluded that "[a]lthough there may not be great differences among these various phrasings, it is important to settle upon a single formulation for this Court and other courts to employ in deciding this kind of

federal question." *Id.* The legal formulation settled upon was: "whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* at 380, 110 S.Ct. 1190.

3. *Weeks v. Angelone*, 528 U.S. 225, 236, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (citing *Boyde*, and holding that death-penalty mitigating-evidence instructions were constitutionally adequate); *see also Estelle v. McGuire*, 502 U.S. 62, 74–75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (stating that "[w]hile the instruction was not as clear as it might have been, we find that there is not a 'reasonable likelihood' that the jury would have concluded that this instruction, read in the context of other instructions, authorized the use of propensity evidence pure and simple").

4. *Weeks*, 528 U.S. at 238, 120 S.Ct. 727 (Stevens, J., dissenting).

5. *Johnson v. Texas*, 509 U.S. 350, 368, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) (quoting *Boyde*, 494 U.S. at 381, 110 S.Ct. 1190).

problem child here at a very early age, a young capital murderer that was growing up in her midst." He was educationally and socially deprived as a child, but he was also a "faker," a "manipulator" with "an anti-social personality." He had unrepentedly raped before, and was sent to prison because his victim—left alive—could identify him. When he raped again, he was shrewd enough to kill his victim so she could not identify him and have him sent back to prison. Whatever his educational deficiencies, he was "street smart" enough to be fully accountable and morally culpable for his capital crime.

The defense presented an entirely different version of him: Johnny Paul Penry was a pitiable man with severe mental impairments and a "history of severe and serious and sustained child abuse and torture." He was diagnosed at an early age with mental retardation and placed in a special class for the mentally retarded. Instead of receiving love and support for his mental deficiencies, his mother treated him "like an animal." She locked him up in his room, repeatedly beat him, threatened him with a butcher knife, and made him eat his own feces because he had a "broken brain." According to defense counsel, "He's not just mean and bad, through and through. He wants to improve himself. He doesn't have much to work with. But he wants to." These were "mitigating circumstances in this case that reduce moral blameworthiness."

Four weeks of trial testimony circled around the intersection of Johnny Paul Penry's mental abilities and moral culpability and to what extent his mental "slowness" was related to his deplorable childhood.

The potential ambiguity in the jury instruction is caused by a single word, "other," contained within the application instruction for the fourth special issue:

Therefore, you are instructed that if you believe from all the evidence that the Defendant is a person with mental retardation, then you are instructed to answer Special Issue No. 4 "yes." However, if you do not believe from all the evidence that the Defendant is a person with mental retardation, then you shall follow the Court's instructions previously given herein concerning the appropriate answer to Special Issue No. 4 and consider whether any other mitigating circumstance or circumstances exist as defined herein.

The potential ambiguity then is whether there is a reasonable likelihood that, once the jurors unanimously concluded that Penry was not "mentally retarded" as that term had been legally defined, they (erroneously) believed that they could not consider any of the evidence concerning his mental "slowness." That is, did these jurors think that they were prohibited from continuing to consider the evidence of his lack of educational progress, his indisputably low I.Q., and the wealth of evidence concerning "deficits or impairments in present adaptive functioning" in the areas of "[c]ommunication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety" that existed before the age of eighteen? If so, in answering the fourth special issue, the jurors would have ignored the vast majority of the evidence admitted during this lengthy trial.

It seems manifestly unlikely that not a single juror would have protested and said, "Wait, surely we may consider that same evidence of some level of mental deficiency and how Johnny Paul Penry's mental slowness affected his upbringing, character, conduct, and moral culpability?" At least the jurors might reasonably have been expected to send out a note to the judge

requesting clarification if they had questions concerning the meaning of the word "other" in this context.[6]

The absence of such a note or any other sign from the jurors that they did not understand what was expected of them suggests that one of two things happened: they all agreed that "other" did exclude consideration of all mental-slowness evidence or they all agreed that it did not. But to conclude that they would have ignored the mental-slowness evidence would have required them to ignore the content and tenor of every word in the jury instructions except the word "other." The common-sense gist of Special Issue Number Four is simply this: "If you believe that there is any credible reason why this man should not be executed, you must vote for life imprisonment." To conclude that it is "reasonably likely" that this jury did not get the message requires one to assume that they were all mentally slow.

Instead, it is a reasonable likelihood that this jury, like the two previous juries, believed that the State's version and vision of Johnny Paul Penry and his moral culpability was a more compelling one than that presented by the defense. And it was their right to reach that conclusion based upon all of the evidence and a common-sense reading of the jury instructions.

---

6. See Armstrong v. Toler, 24 U.S. 258, 279, 11 Wheat. 258, 6 L.Ed. 468 (1826) (opinion of Marshall, C.J.) ("Had the jury desired further information, they might, and probably would, have signified their desire to the Court.").