

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-76,263

### EX PARTE BRIAN EDWARD DAVIS, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### IN CAUSE NO. 616522 IN THE 230TH DISTRICT COURT
### HARRIS COUNTY

**KELLER, P.J., filed a dissenting opinion in which MEYERS, KEASLER, and HERVEY, JJ., joined.**

The instructions that were given to the jury failed to provide a fully adequate vehicle for considering much of applicant's proffered mitigating evidence in violation of *Penry I*.[1]  Although the jury charge included a supplemental instruction designed to meet *Penry I*'s dictates, the instruction was inadequate under *Penry II*.[2]  After finding error, the Court remands for a new trial, without considering the issues of preservation and harm.  Because applicant failed to object, the record must show egregious harm before he is entitled to relief.  And because the record does not

---

[1] *Penry v. Lynaugh*, 492 U.S. 302 (1989).

[2] *Penry v. Johnson*, 532 U.S. 782 (2001).

show that applicant was egregiously harmed by the *Penry I* error, relief should be denied.

## A. The Appropriate Standard of Harm

When a federal constitutional error has been preserved, or did not need to be preserved, the appropriate standard of harm (at least on direct appeal) is a federal question, controlled ultimately by decisions of the United States Supreme Court.[3]  But when a party fails to comply with a state's rules for preserving a complaint, the federal standard does not control; the party must rely upon the state's rules regarding unpreserved error.[4]  Under Texas criminal law, when no objection is made to an error in the jury instructions, the applicable standard of harm is the "egregious harm" standard articulated in *Almanza*:[5] that the defendant "has not had a fair and impartial trial."[6]  This "egregious harm" standard applies even when the unpreserved error involves a violation of the federal constitution.[7]  The standard is the same on direct appeal and habeas corpus.[8]

With respect to *Penry* claims, we have exempted from preservation requirements those

---

[3]  *Jimenez v. State*, 32 S.W.3d 233, 237-38 (Tex. Crim. App. 2000).

[4]  *Id.* at 238.

[5]  *Almanza v. State*, 686 S.W.2d 157 (Tex. Crim. App. 1985).

[6]  *Jimenez*, 32 S.W.3d at 238, 238 n. 21.

[7]  *Id.* at 238-39.

[8]  *Ex parte Smith*, 185 S.W.3d 455, 463-64, 463 n.21 (Tex. Crim. App. 2006), *rev'd on other grounds*, *Smith v. Texas*, 550 U.S. 297 (2007); *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985).  Depending on the error in question and whether it was preserved, the appropriate standard of harm on habeas corpus may differ from the standard applicable to direct appeals.  *See Brecht v. Abrahamson*, 507 U.S. 619 (1993); *Ex parte Fierro*, 934 S.W.2d 370 (Tex. Crim. App. 1996).

individuals who were tried before *Penry I* was handed down.[9]  Because the law prior to *Penry I* was so firmly settled against any additional mitigating evidence instructions, we held that we were unwilling to fault the defendant or his attorney for failing to lodge an objection.[10]  Although an egregious harm standard would "normally" apply to unobjected-to jury charge error, we "interpret[ed] the Supreme Court cases related to this particular issue to have broader due process implications."[11]  We emphasized, however, that our preservaton holding turned on "the unique circumstances of [the] case, and the state of the law at the time of [the defendant's] trial."[12]

In *Ex parte Smith* (on remand from *Smith I*),[13] we addressed a situation in which the defendant's trial occurred after *Penry I* was handed down.[14]  Explaining that the "egregious harm" standard in *Almanza* was the "usual method" for evaluating unpreserved jury instruction claims, we held that unpreserved *Penry* error would be analyzed accordingly.[15]  Although the defendant objected that the Texas statutory death-penalty scheme was invalid after *Penry I,* because it did not provide to the jury an adequate vehicle for considering mitigating evidence, we held that he failed to preserve

---

[9]  *Ex parte Hathorn*, 2009 Tex. Crim. App. LEXIS 509, 2-4, 8 (April 8); *Ex parte Moreno*, 245 S.W.3d 419, 423, 423 n.15 (Tex. Crim. App. 2008).

[10]  *Hathorn*, 2009 Tex. Crim. App. LEXIS 509, 3-4 (discussing and quoting *Black v. State*, 816 S.W.2d 350 (Tex. Crim. App. 1991)).

[11]  *Id.* at 4.

[12]  *Id.* at 8.

[13]  *Smith v. Texas*, 543 U.S. 37 (2004).

[14]  *See Smith*, 185 S.W.3d at 457 (trial occurred in 1991).

[15]  *Id.* at 463-64, 467-68; *see also Penry v. State*, 178 S.W.3d 782, 788 (Tex. Crim. App. 2005)(addressing error within *Almanza* framework).

error because he did not object to the nullification instruction that was submitted.[16]

In *Smith II*,[17] the Supreme Court reversed, holding that this Court misconstrued the nature of the error at issue.[18] The Supreme Court found that we were under the "mistaken belief that *Penry II* . . . rested on a separate error arising from the nullification charge."[19] But, "it was the special issues, not the nullification charge, that created the error."[20] Because Smith had objected to the special issues, he had preserved error.[21] It appeared to the Supreme Court, then, that the proper standard of harm under Texas law was the "some harm" standard articulated by *Almanza* for errors that were preserved.[22]

Applicant was tried in 1992, which was after *Penry I* was handed down. The parties and the trial court were well aware of *Penry I* at the time of trial, as evidenced by the parties' voir dire, the parties' closing arguments, and the supplemental jury charge.[23] Moreover, the Legislature had already enacted §2(e) of Article 37.071, requiring the submission of a mitigation special issue, though, at the time, the change in the law applied only to offenses committed on or after September

---

[16] *Smith*, 185 S.W.3d at 461, 461 n.8.

[17] *Smith v. Texas*, 550 U.S. 297 (2007).

[18] *Id.* at 313-15; *but see id.* at 316-23 (Alito, J., dissenting).

[19] *Id.* at 314.

[20] *Id.* Finding that the State understood this fact, the Supreme Court quoted from its brief: "In essence, the [nullification] instruction did not *create* new error; rather, the instruction simply *failed to correct* the error identified in *Penry I*." *Id.* (brackets and emphasis in *Smith*).

[21] *Id.*

[22] *Id.* at 315.

[23] *See* this opinion, *post*.

1, 1991.[24]  So the law was no longer firmly established against giving an instruction designed to allow the jury to give effect to mitigating evidence.  Rather, Supreme Court caselaw required such an instruction and, in fact, the Legislature had passed a statute requiring the submission of a mitigation special issue, though that statute did not apply in applicant's case.[25]

And unlike the defendant in *Smith*, the applicant here failed to raise any objection at trial that relates to the Supreme Court's *Penry* jurisprudence.[26]  Therefore, even under *Smith II*, applicant failed to preserve error, and the "egregious harm" standard from *Almanza* applies to this case.

## B. Whether the Requisite Level of Harm Has Been Shown

"Egregious harm" is a difficult standard to meet.[27]  The error must have "created such harm

---

[24]  *See* Acts 1991, 72nd Leg., ch. 838, §5.  Effective for offenses committed on or after September 1, 1991, TEX. CODE CRIM. PROC. art. 37.071, §2(e) required submission of the following issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

*See* Acts, 1991, 72nd Leg., ch. 838, §1.

[25]  There is at least one published decision in which a mitigation special issue was submitted despite the absence of statutory authorization.  *Garcia v. State*, 919 S.W.2d 370, 397-98 (Tex. Crim. App. 1994)(on rehearing).

[26]  In the habeas proceedings, the district judge specifically found that "applicant did not object to the Texas death penalty scheme at trial or direct appeal on the basis that it prevented the jury from considering and giving effect to his mitigating evidence; the applicant did not object that the former punishment special issues were an inadequate vehicle for the jury's consideration of mitigating evidence."  After examining the trial record myself, I have been unable to locate any objection that has any conceivable relationship to the Supreme Court's *Penry* jurisprudence.

[27]  *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002); *see also Young v. State*, 283 S.W.3d 854, 880 (Tex. Crim. App. 2009)(Cochran, J., concurring)(Egregious harm is "a high and

that [the defendant] was denied a fair trial."[28]  In determining whether the defendant suffered

egregious harm, the reviewing court should examine "the entire jury charge, the state of the evidence,

including the contested issues and weight of the probative evidence, the arguments of counsel, and

any other relevant information revealed by the record of the trial as a whole."[29]  The defendant must

have suffered "actual, rather than theoretical, harm," and the harm suffered must be of the sort that

"affect[s] the very basis of the case, deprive[s] the defendant of a valuable right, or vitally affect[s]

a defensive theory."[30]

>    The jury was given the following supplemental instruction:

>    You are instructed that when you deliberate on the questions posed in the special
>    issues, you are to consider all relevant mitigating circumstances, if any, supported by
>    the evidence presented in both phases of the trial, whether presented by the State or
>    the defendant.  A mitigating circumstance may include, but is not limited to, any
>    aspect of the defendant's character, background, record, emotional stability,
>    intelligence or circumstances of the crime which you believe could make a death
>    sentence inappropriate in this case.  If you find that there are any mitigating
>    circumstances in this case, you must decide how much weight they deserve and
>    thereafter, give effect and consideration to them in assessing the defendant's personal
>    culpability at the time you answer the special issue.  If you determine, when giving
>    effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative
>    finding to the issue under consideration, rather than a death sentence, is an
>    appropriate response to the personal culpability of the defendant, a negative finding
>    should be given to that special issue under consideration.

>    This was an ambiguous instruction, like the one given in *Penry II*, that, on its face, could be

interpreted either as telling the jury (1) to take "mitigating evidence into account in determining their

---

difficult standard which must be borne out by the trial record.").

[28]  *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008).

[29]  *Id.*

[30]  *Id.* at 461-62.

truthful answers to each special issue," or (2) to "simply answer one of the special issues 'no' if it believed that mitigating circumstances made a life sentence appropriate regardless of its initial answers to the questions."[31] The former interpretation added nothing to the special issues,[32] while the latter interpretation – as a "nullification" instruction – placed jurors in an ethical dilemma that created a reasonable likelihood that the jury was prevented from considering the defendant's proffered mitigating evidence in an appropriate manner.[33] A clear nullification instruction, such as the one given in *Smith I*, would be subject only to the second criticism.[34]

Because the instruction in the present case was ambiguous, a harm analysis must consider the likelihood that the jury understood that it had the power to "nullify" the special issues based on mitigating evidence (that is, give a negative answer to at least one of the special issues on the basis of mitigating evidence that was not encompassed by any of the special issues). As I will explain more fully below, the jury was informed of its power to nullify in both voir dire and closing arguments. In *Penry II*, the Supreme Court suggested that discussions during voir dire and closing arguments might be used to clarify that an ambiguous instruction was in fact a nullification instruction.[35] In that case, the judge, the prosecutor, and defense counsel explained the instruction in nullification terms during voir dire, and defense counsel gave a similar explanation during closing

---

[31] *See Penry II*, 532 U.S. at 798 (quoting the State's brief; ellipses omitted).

[32] *Id.*

[33] *Smith I*, 543 U.S. at 47-48; *Penry II* at 799-800.

[34] *Smith I*, 543 U.S. at 47-48.

[35] 532 U.S. at 800-01.

argument.[36]

But the Court expressed three concerns about whether the jurors in *Penry II* really understood that a nullification instruction was being submitted.  First, because voir dire began almost two full months before penalty phase deliberations, and the jurors were subjected to five-day trials on both guilt and punishment, plus attendant instructions, the Court was skeptical about whether the jurors would remember the voir dire explanations.[37]  Second, the Court suggested that defense counsel's arguments might not be an adequate substitute for statements of law by the trial court.[38]  Finally, the Supreme Court found that the prosecutor effectively neutralized the defense counsel's argument by stressing the jurors' duty to follow their oaths, the evidence, and the law – resulting in the jury receiving, at best, "mixed signals."[39]  I address these concerns in light of the egregious harm standard and the record before us.

The Supreme Court's skepticism about whether the jurors remembered the explanations from voir dire may be appropriate in determining whether error took place, but such skepticism is not enough to establish egregious harm. The possibility of fading memories may support a rule in favor of giving jurors unambiguous instructions immediately before or during deliberations, and error may result from the failure to do so.  But the possibility that the jurors' memories would fade constitutes theoretical, rather than actual, harm, and does not establish egregious harm under *Almanza*.

The record in this case reveals that the nullification concept was discussed extensively during

---

[36]  *Id.*

[37]  *Id.* at 801.

[38]  *Id.* at 802 (citing *Boyde v. California*, 494 U.S. 370, 384 (1990)).

[39]  *Id.*

jury selection, and that discussion, in some respects, compares favorably to the Supreme Court's recitation of facts in *Penry II*. All of the jurors in the present case were informed during voir dire that, even if the State proved that the answers to the two submitted special issues should be "yes," the jury could still answer one or both of those special issues "no" based upon mitigating evidence. Most of the jurors were informed of this by at least two of the trial participants, usually the prosecutor and defense counsel.[40] With a majority of the jurors, the prosecutor characterized this situation as a "safety valve" to ensure that the death penalty was not assessed against someone who should not receive it.[41] Most of the jurors were explicitly asked if they understood the nullification concept, and all of those answered affirmatively.[42] The remaining jurors were asked if they could give effect to the concept and answered affirmatively. Most of the jurors were asked if they could apply this concept in an appropriate case, and all of those jurors answered affirmatively.[43] The voir dire accomplished more than simply giving jurors abstract information about the use of mitigating

---

[40] Juror Brisby was informed by the trial court and defense counsel. Jurors Simmons and Jones were informed only by defense counsel, while jurors German and Berry were informed only by the prosecutor.

[41] The "safety valve" characterization was made to jurors Adams, Conrad, Goodwin, Sinderson, Severn, Lofland, German (also using the word "nullify"), and Berry.

[42] Jurors Brisby, Sinderson, and Simmons were not explicitly asked if they understood the concept. In addition to acknowledging that she understood the concept, Juror Adams volunteered that it was "very clear" to her.

[43] Jurors Jones and Berry were not asked this question. When asked if he could apply this concept in an appropriate case, Juror Sinderson said that "background" was a category of mitigating circumstances that he could consider. When asked if she could apply this concept if the State had not proven that the defendant should get the death penalty, Juror Lofland replied, "If they – I don't feel like it was proved to me. Yes, I could do that." Juror Simmons was asked if this method of considering mitigating circumstances despite the proven answers to the special issues was "fair," and she answered affirmatively.

circumstances in a nullification process. The jurors were asked to respond to that information by indicating that they understood how the process worked, or that they could follow the process in an appropriate case, or both.

In an egregious harm analysis, we should look at counsel's arguments in light of the voir dire. The jurors had already been told during voir dire that the law conferred upon them the power and the duty to nullify the special issues based upon mitigating evidence in an appropriate case. The attorneys' arguments at the close of the punishment phase were a reminder of the law that had already been explained to them.

And unlike the situation in *Penry II*, defense counsel was not forced to unilaterally argue the nullification concept, with the prosecutor undercutting those arguments before the jury. Rather, the parties exhibited a shared understanding of the concept. One of the defense attorneys told the jury that there were three issues to resolve at the punishment stage of trial: the deliberateness issue, the future dangerousness issue, and the question of mitigation. The defense attorney defined mitigation as "those factors in [applicant's] life and [applicant's] background that would cause you to believe that, even if the State has approached (sic) beyond a reasonable doubt that the proper answer to issue number one is yes and number two is yes, that a life sentence is appropriate."

The prosecutors' arguments were consistent with defense counsel's understanding. In closing argument, one of the prosecutors outlined the two special issues and then said, "Of course, you will have to take into consideration the mitigation issue, if any, but it's in here that those are the two issues and when you answer those two issues you've done your job." Later, the prosecutor explained, "The Court's charge informs you that you are to consider all relevant and mitigating circumstances. If you find there is a mitigation in this case. First, find it is true mitigation in a case.

If there is any, how much weight does that mitigation deserve and then you determine if a life sentence is an appropriate response to the personal culpability of the defendant." In arguing for the death penalty, the prosecutor later stated, "I submit to you, ladies and gentlemen, that if you find there are mitigating factors in this case, that they don't come up near to excusing this or to offsetting what he's done and what he's capable of."[44]

The other prosecutor attacked applicant's proof of mitigating circumstances, but not the legitimacy of offering such evidence as an independent reason to reject the death penalty: "Mitigation in a capital murder case. Mitigation first of all means you have to believe it's true. . . . You heard about dyslexia and epilepsy and hyperactivity. Those are [defense counsel's] questions and insinuations and hopes. You didn't have one witness or one doctor come in here and tell you that [applicant] has any of those conditions. Why not? Because he doesn't. He's perfectly normal. His only problem is that he's mean." Later, the prosecutor expounded: "Mitigating evidence. True mitigating evidence is something that would cause you to think a death penalty is not appropriate. Evidence such as the defendant being sexually abused as a child for years and years. . . . Mitigating evidence is somebody who really is retarded." The prosecutor later continued: "There is no mitigating evidence in this case. And if you find that all of those things [alleged by applicant] even added up, if you believed they were mitigating evidence, they still don't rise to the level where a

---

[44] The prosecutor continued by arguing: "He's too dangerous. He's far too dangerous to ever let this man here get anywhere near a knife, a knife, anything else that could injure his fellow human beings, whether it's outside of the prison or inside of the prison." It is legitimate to argue that the proffered mitigating circumstances do not outweigh the aggravating evidence. *See Jackson v. State*, 992 S.W.2d 469, 478 (Tex. Crim. App. 1999)("aggravating circumstances can be considered in connection with the mitigation special issue"–upholding refusal to submit instruction limiting the jury's consideration of extraneous unadjudicated offenses or bad acts to the future dangerousness punishment issue).

death sentence is not appropriate in this case."[45]

The upshot of this discussion is that there is plenty of reason to think that the jury did understand that it had the power to "nullify" the special issues on the basis of mitigating evidence. If the jury understood that it had the power to "nullify," then the jury had a vehicle, however imperfect, through which it could give full effect to all mitigating evidence. Under those circumstances, a defendant who failed to object can hardly be in a position to claim that his trial was unfair. If he had wanted the jury to receive a more perfect vehicle for considering his mitigating evidence, he should have done something to alert the trial court to the problem.[46] By failing to

---

[45] The prosecutors emphasized the strength of the aggravating circumstances in applicant's case. Some of the aggravating evidence discussed included the following: Applicant was expelled from high school and was diagnosed with intermittent explosive disorder. He had been incarcerated twice before the instant offense. He could not follow prison rules. He had previously escaped from a halfway house. Twenty-one days after he was released the second time, he committed another robbery. During that robbery, applicant beat the victim and wanted to kill him, but the victim was not killed because applicant's accomplice did not want to commit a murder. The victim of the instant robbery-murder offense was a mentally retarded person, who would have been incapable of telling the police who had hurt him, so the murder was not even necessary to cover up the robbery. And seven days after killing the victim in this case, applicant robbed another person and tried to kill him. Though that person did not die, applicant did succeed in slitting his stomach, resulting in a scar that would last for life. Applicant also beat his girlfriend.

As mitigation, applicant put on evidence of learning disabilities, emotional problems and alcohol and drug abuse from an early age, a violent and emotionally traumatic family upbringing, and head injuries. The trial judge in the habeas proceedings concluded that all of these constituted mitigating evidence under the "low threshold" showing required by *Tennard v. Dretke*, 542 U.S. 274 (2004), except for the head injuries, which the trial judge concluded were very minor.

An egregious harm analysis could take into account the strength of the State's aggravating evidence versus the defendant's mitigating evidence to determine whether the submission of a different instruction on mitigating evidence would likely have made any difference. Given my reasoning below, however, it is unnecessary to conduct such an analysis to conclude that egregious harm was not shown in this case.

[46] *See Whatley v. State*, 946 S.W.2d 73, 75-76 (Tex. Crim. App. 1997)(a showing of fundamental unfairness sometimes requires a request for a particular remedy when the defendant has at least some notice of the problem in time to make a request).

object, the defense attorney signaled his own belief in the fairness of the proceedings. If applicant thinks his attorney should have acted differently, he has a better remedy than claiming that he was egregiously harmed: an ineffective assistance of counsel claim, where the attorney can explain whether he had a trial strategy and what it was, and if deficient performance is found, an evaluation can be conducted under the less onerous standard of prejudice articulated in *Strickland v. Washington*.[47]

      I respectfully dissent.

Filed: November 18, 2009
Do Not Publish

---

[47] 466 U.S. 668, 694 (1984)("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").