IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,228






EX PARTE LAROYCE LATHAIR SMITH, Applicant






ON REMAND FROM 


THE SUPREME COURT OF THE UNITED STATES 


ON AN APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM DALLAS COUNTY





 Cochran, J., delivered the opinion of the Court in which Keller, P.J.,
and Price, Womack, and Johnson, JJ., joined. Hervey, J., filed a concurring
opinion in which Keasler, J., joined. Holcomb, J., filed a dissenting opinion. 
Meyers, J., not participating.


O P I N I O N 
 


 This death-penalty habeas corpus case is on remand from the United States Supreme
Court. (1) Our original opinion held that the Penry (2) jury nullification instruction given in
applicant's case was not constitutional error because: (1) applicant's mitigation evidence
was not "constitutionally relevant"; (2) his evidence was encompassed by the two statutory
special issues, thus no special instruction was necessary; and (3) if a special instruction was
necessary, the nullification instruction sufficed. (3) The Supreme Court reversed this Court's
decision on the first and third issues; arguably, it did not approve of our resolution of the
second issue. We now hold that, assuming that the statutory special issues were not wholly
sufficient to allow the jury to give "full consideration and full effect to mitigating
circumstances," (4) applicant has failed to show "egregious harm" under Almanza (5) for this
unobjected-to jury-charge error. We therefore deny relief.

I.


 In 1991, a jury convicted applicant of capital murder for the robbery-murder of
Jennifer Soto. Because an analysis of all of the evidence offered at trial is an essential
component of any Almanza "egregious harm" analysis, we set out that evidence in detail.

 First, we review the evidence from the guilt stage. The State's evidence showed that
Jennifer Soto was a 19-year-old girl who worked at Taco Bell. She was a hard worker and
had been promoted to shift manager two weeks before her death. Applicant had worked at
Taco Bell with her. On the evening of January 7, 1991, she was "closing manager" and
Travis Brown was working with her. He was waiting for her to finish her office paperwork
because she was going to give him a ride home.

 Meanwhile, Nickles Lewis and two other friends came to applicant's house. 
Applicant told them that he was going to rob Taco Bell because he needed "some money for
court." The four youths left applicant's house on foot, but they were soon picked up by
Kevin Shaw and one of Shaw's friends who were riding around in Shaw's car. They stopped
at another house so applicant could get a gun, and applicant said, "We're going to hit T.B." 
Applicant knew Jennifer would be working that night. He told one of his cohorts, "If she
see[s] my face, I will have to kill her." 

 Kevin Shaw parked the car containing the six youths across the street from the Taco
Bell. Applicant, Kevin Shaw, and a third member of the group, Devario Smith, got out of
the car and paced outside the Taco Bell, waiting for Jennifer to come out of the back door. 
They waited 45 minutes, but she did not come out. When "things didn't go right," they all
got back into the car and started to leave, but applicant said, "No, man, it got to be done. It
got to be done." They turned around and went back. 

 At about 11:30 p.m., applicant knocked on the front door and asked to use the phone
because his car had broken down. Travis, without opening the door, said that the Taco Bell
was closed and that applicant could not come in. Applicant then asked to see Jennifer and
when she came to the door, he repeated his request. Jennifer opened the door partway and
applicant hugged her as he, Kevin, and Devario went inside. She showed applicant the
telephone and went back to the office to finish up her paperwork while applicant's two
companions stayed in the front with Travis. 

 After he pretended to finish his telephone call, applicant came back to the front and
told Travis that "they were going to rob the place." Kevin told Travis, "If you keep your
mouth shut, you'll get a cut of the money." Applicant went back, by himself, into the office
where Jennifer was working.

 Shortly thereafter, Travis heard yelling. When he went to investigate, he saw
applicant holding Jennifer in a headlock. He was "pistol-whipping" her on the head with the
butt of a gun. He kept hitting her until the gun's handle fell off. Applicant demanded the
combination of the safe, but Jennifer screamed, "Call Tina, call Tina." She did not know the
combination. Travis saw applicant step back, point the gun at Jennifer's back and shoot her
at point blank range. She cried, "God, please don't let me die." 

 Applicant then went into the kitchen area, grabbed a butcher knife, and came back to
Jennifer, continuing to demand the combination. He stabbed her underneath the left breast
to make her tell him the combination, but when she did not give him the information he
wanted, he stabbed her in the thigh, then the abdomen, then the head. The State
characterized these as "torture type wounds." Finally, he sliced her neck, severing the
jugular vein. Both the gunshot and the neck wound were fatal.

 Applicant, still carrying the bloody knife, walked out to the front. Travis jumped out
of the way, saying "Hey, I don't know your face. I've never seen you. I don't know
anything." Applicant replied, "Hey, I know your face and I'll kill you." After applicant and
his two cohorts left, Travis called 911.

 Applicant testified on his own behalf and stated that he was nineteen years old at the
time of the robbery-murder and that he was, by the time of trial, the father of a baby boy. He
stated that when Kevin Shaw drove by on January 9, 1991, he stopped and asked applicant
and his friends if applicant's "homeboy" would let Kevin use his gun. Applicant went to his
friend's apartment and asked him if Kevin could buy his gun. The friend agreed and gave
applicant his gun, which was in a bag. Nobody said anything about going to the Taco Bell
until the car arrived there. 

 Then, according to applicant, Kevin suddenly announced, "I'm fixing to rob Taco
Bell." Kevin explained to applicant, "Travis is going to open the back door so I can rob it." 
Applicant and two others waited around for a while, but Travis did not come outside, so they
all left, but Kevin insisted that they return. According to applicant, Kevin knocked on the
door, Travis opened it, and Kevin, Devario, and applicant entered. Jennifer never came to
the front of the store. Applicant stayed in the front with Travis until he heard a shot, and then
he went back to the office and saw Kevin hitting Jennifer with the gun until it broke. Kevin
told Jennifer to open the safe, but she didn't know the combination. Then Kevin picked up
a butcher knife and started stabbing Jennifer. Applicant grabbed the bloody knife away from
Kevin and started out of the store with it. Travis said, "Damn, man, that wasn't even in it."
Applicant testified that Travis's statement meant that killing Jennifer was not part of the
"plan" to rob the Taco Bell that Travis was involved in. 

 Applicant said that he knew Jennifer, liked her, and thought that "no one should die
the way she died." According to applicant, all of the State's witnesses, including his friends
who were with him that night, lied about the robbery-murder at Taco Bell. He was a "Good
Samaritan" who tried to save Jennifer by grabbing Kevin's knife. 

 The jury rejected applicant's version of the events and convicted him of capital
murder. 

 During the punishment phase, the State offered evidence that, two days after
murdering Jennifer, applicant had physically assaulted Chris Standmier, the former boyfriend
of applicant's then-current girlfriend. Chris testified that he was home for the Christmas
holidays from Prairie View University. He was standing in his mother's apartment parking
lot when two cars pulled up. Applicant got out of one of them, took out a baseball bat and
proceeded to beat Chris with it. Applicant hit Chris so hard that the bat broke in two. As
Chris lay on the ground, applicant went back to the car, pulled out a Tech 9 pistol from the
car, cocked it and told Chris, "N____, get back from me. I'm going to kill you. I'll kill you." 
Chris said, "You got me." Then applicant got back into the car and they drove off. Chris
went to the hospital. 

 The State also offered evidence that two months before the capital murder, officers
arrested applicant on outstanding warrants as he was walking down the middle of the street
in a high-crime area. While booking him into the jail, officers found ten ziplock baggies of
crack cocaine in his underwear.

 Several of applicant's teachers testified about applicant's conduct in school. One
teacher, who taught applicant economics and math, testified that applicant was "taunting" in
class and used abrasive, obscene language. He was sometimes mean and sometimes
"docile." This high school teacher said that applicant seemed "threatening"-as if he would
hurt the teacher-when he insisted that the teacher give him a passing grade in economics. 
The teacher was scared, in part because he was positive that applicant had earlier stolen his
car's tires and rims.

 Applicant's middle school vice-principal testified that he had suspended applicant
from school for disruptive behavior in the classroom, possible weapons violations, throwing
objects at teachers, and profanity. He had a bad reputation for peaceful and law-abiding
activity and for respect toward authority.

 A Dallas police officer, a member of the Youth Division at applicant's high school,
testified that he found a Tech 9 in a locker shared by applicant and Nickles Lewis. Nickles
told the officer that the gun was his, but applicant had five bullets in a bag he was carrying
at the time. The officer thought applicant had a gun also, but he was unable to find it.

 The defense called nineteen witnesses during its punishment case. Fifteen of those
were character witnesses. Applicant's middle school assistant principal testified that he had
"8,000 problems at school, but applicant wasn't one of them," because he did not recall
applicant. A pastor said that applicant's family attends church, and applicant always came
with his mother. "[H]e's always been an impressive young man." He showed respect to the
people at church and to his mother. When the pastor visited applicant in jail he showed
remorse for Jennifer's death: he began to cry and said, "I saw her body." He thought
applicant was capable of rehabilitation. The pastor said that he was aware that applicant's
father stole from the family to support his crack habit. He said that such things have an
adverse effect upon children: "Family troubles definitely affect the children." Although the
pastor had never been to applicant's home and had never counseled applicant personally, he
did not think that applicant would be a future danger to society.

 The custodian of records for the special education department of the Dallas ISD
testified that applicant's records showed that he could not read or do numbers in
kindergarten. According to his kindergarten teacher, applicant "is a little rough, but enjoys
his friends; he must be kept separate from a few because he's easily led into trouble." At the 
age of ten, applicant was diagnosed as learning disabled with a speech handicap. He was put
into a special education reading group (6) and given speech therapy. Acording to these school
records, when he was eleven in 1982, applicant was 

 implicated in numerous thefts at school, particularly of the speech clinician's
purse. School contact with the parent indicated that LaRoyce has also been
believed to be stealing at home. . . . Family stresses are reported. LaRoyce's
behavior in class is exemplary and it has shocked school personnel that
LaRoyce has been involved in stealing. He has admitted to theft and has cried
when questioned about misbehavior.


At the age of thirteen, his WISC-R I.Q. testing showed a verbal I.Q. of 75, performance I.Q.
of 84, and a full scale I.Q. of 78. At the end of 1986, applicant was phased out of the special
education reading program because he then performed at grade level. 

 A high school classmate and football player testified that applicant once came to his
rescue when a group from another high school "jumped him" and stabbed him. He thanked
applicant, who said, "That's what friends are for."

 Applicant's fiancee, the mother of his child, testified that applicant is not violent. 
Applicant would advise her sisters about doing their homework and not to make mistakes
like he did. "Don't do what I did, you know, and slack off." According to her, applicant
"just got with the wrong people, that's all." According to the fiancee's mother, applicant
acted like a surrogate father to his younger sister. "[H]e appeared to try to guide her and
keep her aware of society, people, boys, and things, and help her select appropriate young
men friends." He is "a person who has been taught right from wrong and who respects
society and respects people." He has an "average" intelligence and "is a person who has an
intelligence capable of understanding and learning."

 Applicant's best friend testified that he had not seen applicant be abusive to women. 
Applicant's brother, Myron, worked for UPS. He testified that when applicant's father went
off on his motorcycle and used crack, Myron acted as a father figure to applicant. 
Applicant's mother brought her VCR, TV, microwave, and Tupperware over to Myron's
house so applicant's father couldn't steal them and sell them for drugs. The family problems
"affected" applicant, but Myron did not elaborate on the effect of these problems. A friend
of applicant's mother testified that the father's drug habits affected the family because his
mother had to act as both parents and she had "to pay the bill if we go out to eat like we used
to." A legal assistant and student at UT-Arlington thought applicant was "a big loveable
teddy bear" who had a lot to contribute to society because "he is willing to help people." A
69-year-old former neighbor testified that applicant "has been a good neighbor" and played
with his grandchildren. A woman who had dated applicant's older brother testified that when
she had a young baby and no income, applicant invited them to stay at his house. He let her
use his bedroom with its queen-sized waterbed while he slept on the living room sofa. 
Applicant told her that because of his father's drug habit, he had to be the man of the house,
so he went out and got a job at age fifteen or sixteen. The mother of one of applicant's
former girlfriend's testified that she never had a problem with applicant; he was a fun person,
always kidding around. He brought her a corn plant and a couple of ivy plants; he bought
her some mirrors. Another friend testified that applicant is a nice young man: "He's the type
I wouldn't mind having for a son." He was never disrespectful or violent.

 Applicant's mother testified that she thinks applicant still has worth and value as a
human being. Applicant "is a good child. He was a slow learner, but he's worthwhile. 
There's no way [applicant] would have hurt Jennifer. He was too crazy about Jennifer. She
was a good and decent child. I'm so sorry for [her] family." Applicant's mother knew that
applicant "would never hurt nobody."

 In rebuttal, the State called a different middle-school assistant principal who testified
that he had received numerous disciplinary referrals about applicant. One of them read,
"LaRoyce talks out in class daily. He laughs out loud, plays around, and disrupts class daily. 
I cannot tolerate him." Applicant told a different teacher, "I'm going to kick your ass." 
Another of applicant's high school teacher's testified that he had applicant in his pre-Algebra
and physical-science class. "In one class, he called me a m___f____ 7 times in one 55
minute period. On two occasions he tried to kill me. On one occasion he was going to put
a bullet in my m____f____ing head." Applicant was taken out of this teacher's class after
about six weeks: "He would come in with no books, no preparation, never do any work, and
sit sideways in the seat and just act like a little portent of evil. . . . He was always a big-time
problem. It was a constant conflict."

 At the punishment-charge conference, applicant requested an instruction on the
objectives of the Penal Code as set out in Section 1.02; the trial court granted that request. 
Applicant also objected to the "anti-parties" instruction and asked for an instruction requiring
the jury to find, "point-blank," that it was applicant who "directly" killed Jennifer by his own
conduct. The trial court refused that instruction. The trial judge also gave the jury a non-statutory nullification instruction pursuant to the Supreme Court's then-recent decision in
Penry v. Lynaugh. (7) Applicant did not object to the jury nullification instruction. (8)

 Based upon the evidence admitted at trial and the trial judge's instructions, the jury
answered the two special issues "yes," and the trial judge sentenced applicant to death.

 On direct appeal, applicant claimed that, under Penry I, Article 37.071 was
unconstitutional because the jury was unable to give effect to his mitigating evidence in
answering the special issues. (9) We rejected this claim and held that, even if applicant's
mitigation evidence were beyond the scope of the two statutory special issues, the trial
judge's supplemental instruction provided a sufficient vehicle for the jury to fully consider
all of that evidence. (10) The Supreme Court declined to review applicant's claims on direct
appeal. (11) We dismissed applicant's first petition for writ of habeas corpus because it was
untimely filed, and he did not show any excuse or exception for its late filing. (12) The Supreme
Court again denied certiorari. (13) We then allowed applicant to file a second petition for writ
of habeas corpus which included, inter alia, a claim that the trial judge's supplemental
"nullification" instructions were unconstitutional under the Penry II standard announced by
the Supreme Court in 2001. We denied relief, (14) but the Supreme Court reversed our decision
based upon its own opinion in Tennard v. Dretke, (15) which was delivered several months after
our decision. 

 In our former opinion, we noted that applicant relied on evidence of 

 (1) his limited mental capacity, specifically that he was a "slow learner" in school,
that he had an I.Q. of 78 and possible organic learning disabilities, and that he
had dropped out of school in the ninth grade at the age of eighteen;


 (2) his youthful age of nineteen at the time he committed this capital murder; and


 (3) his father's time in prison, involvement with a motorcycle gang, drug and
alcohol use, and stealing from his own family;


to support his claim that he produced Penry-type evidence beyond the scope of the two
statutory special issues. (16) We held that applicant had failed to show that

 any mitigating quality of his family background and mental-limitations
evidence could not be fully encompassed by the two statutory special issues. 
Applicant's mental limitations were surely relevant to whether he acted
deliberately in committing this robbery-murder and both his learning disability
and troubled background were relevant to whether he would constitute a future
danger to society. In Penry, the evidence supported an inference that the
defendant was unable to learn from his mistakes as a result of his low I.Q.,
brain impairments, and severe childhood abuse. Thus, he was more likely to
be a future danger because of his permanent disabilities. Here, the evidence
shows the reverse: despite applicant's limitations and difficulties, his behavior
in school was often "exemplary." There is no evidence that applicant was
unable to learn from experience or unable to control his conduct, with or
without his disabilities. (17)


The Supreme Court did not address our conclusion "that the two special issues provided
applicant's jury with a constitutionally sufficient vehicle to give effect to his mitigating
evidence." (18)

II.


 The usual method by which we assess purported jury instruction or charge errors is
set out in Almanza v. State. (19) The Almanza standard applies both on direct appeal (20) and on
the review of habeas corpus applications. (21) Almanza applies to federal constitutional errors
contained within the jury charge. (22) Under that familiar standard, we must decide:

 1. Was there error in the jury charge?

 2. If so, "the next step is to make an evidentiary review . . . as well as a review
of any other part of the record as a whole which may illuminate the actual, not
just theoretical, harm to the accused." If the defendant failed to object to the
jury charge, he must show that the error caused him such egregious harm that
he did not have "a fair and impartial trial." (23) 


We will apply our usual Almanza analysis to applicant's claim that the jury charge did not
ensure that the jury could give full effect to his mitigation evidence. 

 Therefore, we first re-examine whether applicant's mitigation evidence was fully
encompassed within the two statutory special issues. (24) In our 2004 opinion, we held that the
jury could fully address this evidence within the confines of the two special issues, but we
used an analytical framework that was later repudiated by the Supreme Court in Tennard. (25) 
We are uncertain whether the Supreme Court also concluded that some of applicant's
mitigation evidence was outside the reach of the two special issues, and, if so, exactly what
evidence was beyond the ambit of those special issues. 

 Traditionally, this Court has looked to the factors set out in Keeton v. State (26) (decided
two years before Penry I) to determine whether the State has proven, beyond a reasonable
doubt, that the defendant would probably commit criminal acts of violence that would
constitute a continuing threat to society. Those factors include, but are not limited to:

 (1) the circumstances of the capital offense, including the defendant's state of
mind and whether he was working alone or with other parties; 


 (2) the calculated nature of the defendant's acts; 


 (3) the forethought and deliberateness exhibited by the crime's execution; 


 (4) the existence of a prior criminal record, and the severity of the prior crimes; 


 (5) the defendant's age and personal circumstances at the time of the offense; 


 (6) whether the defendant was acting under duress or the domination of another
at the time of the offense; 


 (7) psychiatric evidence; and 


 (8) character evidence. (27)


We relied upon these specific factors in rejecting applicant's claim, on direct appeal, that the
evidence was insufficient to prove, beyond a reasonable doubt, that applicant would probably
commit criminal acts of violence that would constitute a continuing threat to society. (28) 
Indeed, in his brief on direct appeal, applicant relied upon the very evidence that he now
contends the jury could not adequately address under the two special issues to support his
argument that the evidence was legally insufficient to show his future dangerousness. There
he argued: "Appellant was nineteen years old at the time of the offense. He produced
evidence that he was close to being mentally retarded and at the very least had a history of
learning disabilities. His evidence showed a history of family strain caused by his father,
who sold the family's personal property to buy cocaine." (29) According to applicant, this
evidence, coupled with "[a]ppellant's extensive character evidence, which essentially went
unrebutted by the State, established that appellant did not have a violent character and that
the offense was an aberration." (30)

 It would logically follow that, if applicant's mitigating evidence fit within the Keeton
factors and was relevant in assessing the legal sufficiency of the evidence to support a jury's
verdict of "future dangerousness," that evidence would be encompassed under the "future
dangerousness" special issue. Evidence of applicant's youth would clearly be encompassed
under the fifth Keeton factor, and Texas courts have agreed with the Supreme Court that the
mitigating value of a defendant's youth can be considered under the "future dangerousness"
special issue. (31) Similarly, evidence of applicant's generally "exemplary" behavior in his
special-education classes could be considered under both the fourth and eighth Keeton factors
as showing a relative lack of criminal behavior and generally good character. Evidence of
his father's drug habit and theft from his family which may have "affected" applicant's
character in some way (32) could be considered under the eighth factor. (33) Arguably, evidence
of applicant's somewhat limited mental capacity (a school record notation of a full scale I.Q.
of 78, and another cursory note on the same school form of "possible organic cause for
learning problems") could not be fully considered under the Keeton factors, although Texas
cases have held that evidence of limited mental ability may be considered under both
statutory special issues. (34)

 We also note that numerous post-Smith, post-Tennard Fifth Circuit cases have held
that mitigating evidence of this type is fully encompassed by the Texas "future
dangerousness" or "deliberation" special issues. (35) Nonetheless, because we are uncertain as
to the Supreme Court's current Penry II jurisprudence, (36) we will assume, for the sake of
argument, that at least some of applicant's evidence was not fully encompassed by the two
special issues. Thus, we shall assume that the jury charge in this case was constitutionally
deficient under Penry II.

III.


 A constitutionally deficient jury charge, however, does not result in automatic reversal
of a conviction under Almanza. We must also assess the harm that this deficient jury charge
caused the defendant. Whether sufficient harm resulted from the charging error to require
reversal depends upon whether the defendant specifically objected to the error at trial. Under
Almanza, when there has been a timely objection made at trial, we look only for "some
harm." By contrast, where the error is urged for the first time on appeal or an application for
habeas corpus relief, we look for "egregious harm." (37) We most recently applied our familiar
Almanza standard of review to constitutional error in the jury charge in reversing the third
death-penalty sentence of Johnny Paul Penry. (38)

 In analyzing jury-charge error under Almanza we review the entire trial record, from
voir dire through closing arguments at the punishment stage, to determine whether applicant
suffered "egregious harm" from the deficient jury charge.

 During voir dire, both the State and applicant questioned almost all potential jurors
regarding their ability to consider mitigating evidence. Both sides explained the process of
allowing jurors to change one of the special issue answer from a "yes" to a "no" if they found
mitigating evidence sufficient to warrant a life sentence rather than the death penalty. 
Overwhelmingly, the jurors agreed that they could change a "yes" answer to "no" if
instructed by the judge to do so upon finding sufficient mitigating evidence. (39) The Supreme
Court specifically noted that the nullification instruction "intensified the dilemma faced by
ethical jurors" (40) in this case. That is indeed a possibility, although neither the jurors who
served, nor the parties or trial judge noted such a potential dilemma or expressed such a
concern, either during voir dire or later. Almanza requires a showing of "actual, not just
theoretical, harm to the accused." (41) Given the record in this case, we cannot say that the
discussion of the special issues and the nullification instruction during voir dire shows
"actual" harm, much less "egregious" harm.

 Turning to the evidence at the guilt stage, the State and the defense painted markedly
different portraits of the Taco Bell robbery-murder and applicant's participation in that grisly

deed. If the jury believed the State's evidence, applicant plotted to commit the robbery, and
he was the leader of the pack. Applicant told a very different story. He had no idea that
Kevin Shaw was planning to go to the Taco Bell that night, much less commit a robbery or
a murder. Applicant was "a Good Samaritan" who snatched the bloody knife away from
Kevin and took it out the door. 

 In sum, the State painted an evidentiary picture of Mr. Hyde; applicant presented a
portrait of Dr. Jekyll. Both of these versions could not be true. The jury believed the State's
version, but applicant's testimonial version of the events did not betray any lack of mental
acuity. His testimony was clear, coherent, concise and consistent. He responded nimbly and
held his own when the prosecutor cross-examined him. 

 The closing arguments at the punishment stage carried out the "Dr. Jekyll and Mr.
Hyde" dichotomy. The State again emphasized the fact that the Taco Bell robbery-murder
was applicant's idea. He knew Jennifer and he used his "charm" to get inside; then he
hugged her. Her murder was premeditated. He showed no remorse: after the murder, he
matter-of-factly told his friends that "we had to shoot a girl," and his only concern was
getting rid of his bloody jacket. The State referred to the prior aggravated assault of Chris
Standmeir to show his continuing violence and to the prior possession of ten packets of
cocaine to show his general lack of lawful conduct as well as his motive for the robbery.

 The defense emphasized applicant's relative lack of prior criminality and his possible
redemption and rehabilitation:

 The law answers those questions no, and only the evidence from that table can
persuade you, if it can, to change those no answers to yes on those questions. 
That's the way the law works. Some of you said that you'd use it only as a last
resort, only for habitual criminals who could not possibly be rehabilitated. . .
. You said you would consider his track record, the kind of person he was deep
down inside.

 . . . 

 Continuing acts of violence. Is he a continuing threat to society? On voir dire,
almost all of you told us that you were looking for someone who had a long
criminal record, that's in and out of the penitentiary, someone who cannot be
rehabilitated. . . . This boy has not spent one day in the penitentiary.


The defense argued that "it's not too late for LaRoyce." It pointed to the fact that many
witnesses had testified that he was "no problem" in school or at home. The defense
mentioned applicant's family life: "I think it would take a fool to not think that the things
that were going on in that family when their daddy was selling their appliances for crack is
not going to have any impact at school." The defense focused on how much worse
applicant's cohort, Kevin, was and how he had a much worse background than applicant. 
He emphasized that applicant did not kill Travis, the other eyewitness, and if he were so
terrible, he would have done so. The defense spoke of the mitigating evidence:

 I want to talk to you about mitigating evidence. Mitigating evidence is that
evidence that reduces the defendant's personal or moral culpability and may
include, but is not limited to, any aspect of his character, record, background,
or circumstances of the offense. It may go to one of the special issues, it may
not, but the court tells you that the State has a burden- that if you think that he
should not die, you are to put "no" in one of the spaces, that the State has the
burden of proof beyond a reasonable doubt to convince each and every one of
you that he should still die.


He spoke of applicant's I.Q.:

 The evidence we have, medical diagnosis, slow learner, may be organic. 
Objective test data, I.Q. 78. He is eight points from being mentally retarded. 
Why do you think LaRoyce gets along so well with kids? Because he's like
one, that's why. Because he's like one. . . . It shows he is not a leader [like
Kevin Shaw], it shows he's a follower.


He spoke of the family problems:


 Family problems. [The prosecutor] will say, "Well, we've all had problems
and many of us have been raised by single parents." That's true, but how
many of us have had our daddies sell our appliances for crack, that we've had
to take and hide our V.C.R.'s, our T.V.'s, our freezers, so our own daddy
wouldn't go and sell it for crack? You know that that has an impact on
someone. It has an impact on how they act in school.


He noted the prodigious number of defense witnesses:


 The numbers do mean something, how many of us could say if we were in
trouble that we could have that many people come and say something good? 
These people know him. You have known him for eight days. They have
known him for their life. They say he should not die. He is not evil. That's
not the only thing you can do with him. . . . there is something good about
LaRoyce. There is something worth saving. . . . They tell you he can be
rehabilitated. Is he the worst of the worst? Is he someone who can't be
rehabilitated? Has the State proven beyond a reasonable doubt that in spite of
this overwhelming mitigating evidence, that he still needs to die, that there is
nothing else we can do with him or to protect society, that you have to
exterminate him like you would a stray dog or cat?


He spoke of remorse:


 Reasonable deduction from the evidence, he has learned and has remorse. 
Why would he cry in front of the minister when he talked about the girl?

 . . . 

 The State of Texas must prove to you beyond a reasonable doubt that
the death sentence should be imposed despite the mitigating evidence. You
shall answer no to one of the issues to give effect to your meaning. LaRoyce's
life is in your hands, no question about that. . . . These people didn't get up
here because they didn't have anything to do and wanted to have a quick thrill
in the courtroom. They testified and came down here because they wanted to
tell you there is something worth saving.


Both the State and defense presented vibrant and compelling arguments for and against the
two special issues and the nature and quality of the mitigating (and aggravating) evidence. 
The primary theme of the defensive evidence and closing argument was that LaRoyce Smith
was a young man whose life was worth saving. He had triumphed over such disabilities as
being a slow learner with family troubles, and had proven himself a role model to other
family members and friends. His pastor spoke on his behalf, as did his mother, brother,
fiancee, and fiancee's mother. All were certain that he would not pose a risk of violence in
the future: "What LaRoyce needs is a controlled environment." 

 In its final argument, the State reminded the jury that they knew applicant was no
dummy. He noted:

 The I.Q. testing, and that's why we- when we see the records and it
shows his I.Q. is 78, we introduce the rest of the packet and we examine that
and we find that his I.Q. is close to 90 on other testing within that file. That's
for your consideration, but I ask you to judge him by his testimony, by his
street-smartness and by his testimony that he gave. Nobody is going to fool
LaRoyce Smith on the witness stand. I mean, he is not a bumbling fool. He
is an intelligent individual and he so testified. No argument there, I would
think.


The State began its closing argument with the following:


 Now, when we talked to you on voir dire, we talked to you about- and
we spent a lot of time talking to you to determine whether or not you could
follow the law. You told us two very important things when we talked to you. 
First of all, you told us that in the appropriate case that you could give the
death penalty. Secondly, you said, "Mr. [prosecutor], Ms. [prosecutor], if you
prove to me that the answers to those special issues should be yes, then I can
answer them yes." If you wavered, if you hesitated one minute on that, then
I guarantee you, you weren't going to be on this jury. We believed you then,
and we believe you now.


Significantly, the prosecutor never suggested that the jury should ignore or fail to consider 
any of applicant's mitigation evidence in deciding whether the answer to those special issues
should be "yes" or "no." Of course, the prosecutor properly focused upon the evidence that
would support a "yes" answer to both special issues, just as the defense had properly focused
upon the evidence that would support a "no" answer to those special issues. The prosecutor
concluded his remarks with the following:

 Ladies and gentlemen, I'm going to be sitting down in just a few
minutes. The case is going to be in your hands. When we talked to you on
jury selection, we talked to you - we told you at that time what we felt the
facts were going to call for, that this was an individual where the ultimate
punishment is earned by him over the years. The brutality of this particular
case standing alone, if you absolutely knew nothing else about LaRoyce Smith
and his background, the brutality alone calls for the death penalty in this case. 
So, please this is the time to have compassion, not for this individual, not for
this outlaw, but for the victim and the victim's family. We'd ask you to
consider that.

 Thank you, Your Honor.


The prosecutor never suggested that applicant's mitigation evidence should be ignored, that
it did (or did not) fit into the two special issues, or that once the jury truthfully answered the
special issues, it should ignore applicant's other mitigation evidence.

 Although the jury ultimately answered the special issues in a way that required the
trial judge to impose the death penalty, we are unable to conclude that the statutory special
issues and nullification instruction caused applicant "egregious harm" in its effect upon the
jury's deliberation of his mitigating evidence. Applicant fails to provide any persuasive
argument that the jury was unable to consider the totality of his extensive mitigating
evidence, to appreciate his punishment theme, or to take into account the specific evidence
of his relatively low I.Q. test at the age of thirteen, his participation in a special education
reading program and speech therapy, or his troubled family background. (42) The basic defense
theme was that he had triumphed over these youthful difficulties; he did not succumb to
them. That is the strategy that his attorneys chose, and this is an approach that a jury might
find persuasive. 

 Applicant's defensive evidence and theme created a very different picture of applicant 
than the evidence and theme that concerned the Supreme Court in Penry. In the latter case,
the Supreme Court was troubled by Penry's "two-edged sword" evidence- the fact that he
was mentally retarded was mitigating, but the fact that he was, therefore, unlikely to learn
from his mistakes and incapable of rehabilitation or reformation, was aggravating. (43) Here,
however, the defense was able to weave applicant's evidence of mental impairment, youth,
and family background into a dramatic account of his humanity and triumph over adversity. 
It provided evidentiary support for defense counsel's well-crafted closing argument that "he
has learned and has remorse" and thus he is "worth saving."

 It is possible that the two special issues may not have fully and completely
encompassed every single bit of applicant's mitigation evidence and he may have suffered
"some" actual harm. However, we do not find that the deficient charge was so egregiously
injurious to his right to have the jury consider and evaluate all of his mitigation evidence that
he did not receive a "fundamentally fair trial." (44) All of his mitigating evidence was admitted, 
defense counsel did a superb job of weaving all of that evidence into a compelling theory of
the case, and his attorneys presented a strong, coherent, and persuasive closing argument on
punishment. We therefore conclude that applicant has failed to show, by a preponderance
of the evidence, that the unobjected-to jury nullification instruction caused him "egregious
harm." We deny relief.

Delivered: March 1, 2006

Publish
1. Smith v. Texas, 543 U.S. 37 (2004) (per curiam).
2. Penry v. Lynaugh, 492 U.S. 302 (1989).
3. Ex parte Smith, 132 S.W.3d 407, 409, 412-16 (Tex. Crim. App. 2004).
4. Penry v. Johnson, 532 U.S. 782, 797 (2001) (Penry II) (quoting Johnson v. Texas, 509
U.S. 350, 381 (1993) (O'Connor, J., dissenting)).
5. Almanza v. State, 686 S.W.2d 157 (Tex. Crim. App. 1984) (op. on reh'g). See Penry v.
State, 178 S.W.3d 782, 788 (Tex. Crim. App. 2005) (applying Almanza harmless error analysis to
constitutionally erroneous jury instruction concerning use of mental impairment evidence that did
not rise to level of mental retardation).
6. In the 1991 trial, the records custodian testified that each year over 13,000 children in
the Dallas Independent School District were involved with special education classes, and the
district employed 800 personnel in that one department.
7. 492 U.S. 302 (1989) (
Penry I).
8. Applicant filed a pretrial "Motion to Declare Tex. Code Crim. Proc. Ann. Art. 37.071
Unconstitutional," claiming that the entire Texas statutory death-penalty scheme was invalid after
Penry I, because "it does not provide for the introduction and subsequent use by the jury of
mitigating evidence which is not relevant or material to the special issues." Therefore, according
to applicant, the trial court was precluded from providing any instructions regarding mitigating
evidence. "For the trial court to create a scheme that would permit the jury to respond to the
Defendant's mitigating evidence would contradict the current status of the law." 

 The trial court denied this motion at a pretrial conference, but gave applicant's counsel a
draft copy of the punishment charge and stated, 

 If you see something in that charge that you'd like worded differently or you think
could be made clearer or better, I'm always willing to entertain different wording
or different ways of putting the idea. So if you come up with something better,
just let me know and I'll look at it.

Applicant did not have any objection to the specific wording of the punishment charge; his
objection went to the continued validity of the Texas statute after Penry I.
9. This claim was based upon his pretrial motion to declare article 37.071 unconstitutional
as applied.
10. Smith v. State, No. 71,333 slip op. at 10-11 (Tex. Crim. App. June 22, 1994) (not
designated for publication).
11. Smith v. Texas, 514 U.S. 1112 (1995). 
12. Ex parte Smith, 977 S.W.2d 610 (Tex. Crim. App. 1998).
13. Smith v. Texas, 525 U.S. 1148 (1999).
14. Ex parte Smith, 132 S.W.3d 407 (Tex. Crim. App. 2004).
15. 542 U.S. 274 (2004).
16. Smith, 132 S.W.3d at 413.
17. Id. at 414-15. We footnoted Graham v. Collins, 506 U.S. 461, 475-76 (1993), in which
the Supreme Court stated, "We do not read Penry as effecting a sea change in this Court's view
of the constitutionality of the former Texas death penalty statute; it does not broadly suggest the
invalidity of the special issues framework." Id. at 474 (emphasis in original). The Supreme
Court explained that in Gary Graham's case, 

 the rule that Graham seeks is not commanded by the cases upon which Penry
rested. In those cases, the constitutional defect lay in the fact that relevant
mitigating evidence was placed beyond the effective reach of the sentencer. In
Lockett, Eddings, Skipper, and Hitchcock, the sentencer was precluded from even
considering certain types of mitigating evidence. In Penry, the defendant's
evidence was placed before the sentencer but the sentencer had no reliable means
of giving mitigating effect to that evidence. In this case, however, Graham's
mitigating evidence was not placed beyond the jury's effective reach. Graham
indisputably was permitted to place all of his evidence before the jury and both of
Graham's two defense lawyers vigorously urged the jury to answer "no" to the
special issues based on this evidence. Most important, the jury plainly could have
done so consistent with its instructions. The jury was not forbidden to accept the
suggestion of Graham's lawyers that his brief spasm of criminal activity in May
1981 was properly viewed, in light of his youth, his background, and his
character, as an aberration that was not likely to be repeated. Even if Graham's
evidence, like Penry's, had significance beyond the scope of the first special issue,
it is apparent that Graham's evidence-unlike Penry's-had mitigating relevance to
the second special issue concerning his likely future dangerousness. Whereas
Penry's evidence compelled an affirmative answer to that inquiry, despite its
mitigating significance, Graham's evidence quite readily could have supported a
negative answer. 

Id. at 475-76. 
18. Smith, 132 S.W.3d at 415-16.
19. 686 S.W.2d 157 (Tex. Crim. App. 1984) (op. on reh'g).
20. See, e.g., Pickens v. State, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005) (unobjected-to
jury charge error is analyzed for "egregious harm" under Almanza).
21. See Ex parte Maldonado, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985) (unobjected-to
jury-charge error is analyzed under Almanza's "egregious harm" standard on habeas). Cf. Ex
parte Dutchover, 779 S.W.2d 76, 77-78 (Tex. Crim. App. 1989); Ex parte Crispin, 777 S.W.2d
103, 104-05 (Tex. Crim. App. 1989), id. at 106-10 (Clinton, J., concurring) (arguing that court
should limit cognizability of habeas claims to "exceptional" constitutional defects so
"'fundamental' as not to be susceptible to a determination of harm").

 Indeed, it would be quite illogical to employ a lesser standard of review for constitutional
error on habeas review than on direct appeal. Were we to follow Almanza for jury-charge error
on direct appeal, but adopt a lesser standard of review on habeas, the natural and logical result
would be that all jury charge claims would be deferred until a person filed a petition for the writ
of habeas corpus.
22. Jimenez v. State, 32 S.W.3d 233, 238 (Tex. Crim. App. 2000). 
23. Almanza, 686 S.W.2d at 174 (such a fundamental error must "go to the very basis of
the case," or "vitally affect his defensive theory").
24. On direct appeal, we did not explicitly address this question. Smith, No. 71,333 slip op.
at 10-11.
25. See Tennard, 542 U.S. at 284-88 (rejecting Fifth Circuit's threshold standard for
constitutionally relevant mitigating evidence); Smith v. Texas, 543 U.S. at 44 (rejecting this
Court's reliance upon Fifth Circuit's standard).
26. 724 S.W.2d 58 (Tex. Crim. App. 1987).
27. Keeton, 724 S.W.2d at 61.
28. Smith v. State, No. 71,333 slip op. at 2-5 (Tex. Crim. App. June 22, 1994) (not
designated for publication). 
29. Brief on Direct Appeal at 27.
30. Id. at 29.
31. See Johnson v. Texas, 509 U.S. 350, 368 (1993) (mitigating value of capital defendant's
youthfulness was encompassed by Texas's second special issue; "It strains credulity to suppose
that the jury would have viewed the evidence of petitioner's youth as outside its effective reach
in answering the second special issue."); Graham, 506 U.S. at 475-76; Barley v. State, 906
S.W.2d 27, 39 (Tex. Crim. App. 1995) ("Evidence of a defendant's age at the time of the offense
is also a relevant consideration to whether a defendant constitutes a future danger to society. The
United States Supreme Court has repeatedly approved of the consideration of a defendant's youth
at the time of the offense because the impetuous qualities associated with youth are typically
mollified by age and maturity.") (citations omitted).
32. It is possible that applicant's conduct of stealing from his mother and his teachers might
be connected to his knowledge of his father's thievery, but no witness ever made such a
connection.
33. See Graham, 506 U.S. at 476 (indicating that family background evidence falls within
the scope of Texas's special issues; "Graham's evidence of transient upbringing and otherwise
nonviolent character more closely resembles Jurek's evidence of age, employment history, and
familial ties than it does Penry's evidence of mental retardation and harsh physical abuse");
Zimmerman v. State, 881 S.W.2d 360, 362-63 (Tex. Crim. App. 1994) (defendant's mitigating
evidence that he came from a "'very disruptive, uneven family environment,' he experienced
parental abandonment on two occasions, and that . . . he had suffered some abuse as a child"
could be considered under two special issues). In our original habeas corpus opinion, we stated
that applicant's 

 father had been in prison for robbery, was involved with a motorcycle gang,
consorted with other women, used alcohol and drugs, and stole from his own
family. This situation upset applicant. Because the family did not have a lot of
money, applicant began looking for work as a young teen-ager. According to
defense witnesses, applicant suffered because of his father's thefts from the family
and from a lack of money in the home.

132 S.W.3d at 413. However, no witness at trial described how the conduct of applicant's father
did, or might have, "affected" applicant, except to say that he got a part-time job at the age of 15
or 16. 
34. See, e.g., Zimmerman, 881 S.W.2d at 362 (defendant's mitigating evidence, including
testimony that his I.Q. was "in the 80's," could be considered under the statutory special issues);
Gunter v. State, 858 S.W.2d 430, 445-46 (Tex. Crim. App. 1993) (mitigation evidence that
defendant was abandoned by mother, abused as a child, and subject to strict discipline by adopted
parents who sent him to school unbathed and unfed as punishment could be considered under
special issues), overruled on other grounds by Riley v. State, 889 S.W.2d 290 (Tex. Crim. App.
1994); Goss v. State, 826 S.W.2d 162, 166-67 (Tex. Crim. App. 1992) (evidence of troubled
childhood is adequately considered within second special issue); Williams v. State, 773 S.W.2d
525, 537-38 (Tex. Crim. App. 1988) (evidence of defendant's low I.Q., though relevant to special
issues, did not preclude jury from finding that he acted deliberately or from making an
affirmative finding of future dangerousness); Goodman v. State, 701 S.W.2d 850, 866-67 (Tex.
Crim. App. 1985) (defendant's evidence of mild mental retardation did not make evidence
insufficient to support jury's findings of deliberateness and future dangerousness), overruled on
other grounds by Hernandez v. State, 757 S.W.2d 744 (Tex. Crim. App. 1988).
35. In most of its post-
Tennard decisions, the Fifth Circuit has concluded that the
defendant's mitigating evidence could be fully addressed by the jury under the two Texas special
issues. See, e.g., 

 Summers v. Dretke, 431 F.3d 861, 882 (5th Cir. 2005) (defendant's evidence of good
character and good conduct could be given effect under Texas's statutory special issues);

 Draughon v. Dretke, 427 F.3d 286, 297-98 (5th Cir. 2005) (defendant's evidence of abuse
as a child and "dysfunctional upbringing" could be given effect under future
dangerousness issue);

 (Roy Gene) Smith v. Dretke, 422 F.3d 269, 287 (5th Cir. 2005) (defendant's evidence of
addiction/intoxication and childhood poverty were seemingly both covered by the special
issues; arguably, evidence of his exposure to a crime-infested environment might not
have been; COA on Penry claim granted);

 Cole v. Dretke, 418 F.3d 494, 500-11 (5th Cir. 2005) (statutory special issues were broad
enough to encompass defendant's evidence of his "destructive family background,"
fragmented personality, organic neurological deficiency, and youth);

 Coble v. Dretke, 417 F.3d 508, 522-27 (5th Cir. 2005) (defendant's evidence of troubled
childhood, mother's nervous breakdown, his orphanage, post-Vietnam mental instability,
mental illness that could be controlled by medication, as well as evidence that he was
well-respected and liked were all covered by statutory special issues; noting that "the
supplemental instruction given in addition to the special issue interrogatories is only
unconstitutional where the special issues themselves are not broad enough to provide a
vehicle for the jury to give effect to the defendant's mitigation evidence"; any error in
giving the supplemental instructions would be harmless and therefore not the basis for
habeas relief);

 Brewer v. Dretke, 410 F.3d 773, 777-78 (5th Cir. 2005) (special issues covered
defendant's evidence that he had a bout with mental illness three months before murder,
co-defendant manipulated him, he was abused by his father, saw his father abuse his
mother, and he abused drugs).

 In Bigby v. Dretke, 402 F.3d 551, 564-72 (5th Cir. 2005), however, the Fifth Circuit found
that the defendant's evidence that he suffered from untreatable chronic paranoid schizophrenia
was not encompassed by the statutory special issues; thus, it granted habeas relief to Bigby.
36. The Fifth Circuit seems to share our uncertainty. See, e.g., (Roy Gene) Smith v. Dretke,
422 F.3d 269, 287 n.8 (5th Cir. 2005) ("We note that the Supreme Court has never explicitly
stated that Penry claims cannot be extended beyond claims involving evidence of 'mental
impairment.' In fact at times, it seems the Court has said the exact opposite. . . . The only
mention the Smith Court made of whether the defendant's evidence was outside the reach of the
special issue questions was the Court's single sentence that 'just as in Penry II, petitioner's jury
was required by law to answer a verdict form that made no mention whatsoever of mitigation
evidence. And just as in Penry II, the burden of proof on the State was tied by law to findings of
deliberateness and future dangerousness that had little, if anything, to do with the mitigation
evidence petitioner presented.'").
37. Almanza, supra, 686 S.W.2d at 171; Arline v. State, 721 S.W.2d 348, 351 (Tex. Crim.
App. 1986).
38. See Penry v. State, 178 S.W.3d 782, 788 (Tex. Crim. App. 2005) (stating that, after
finding constitutional error in the jury charge,"[u]nder Code of Criminal Procedure Article 36.19,
we will not reverse a conviction or sentence on the basis of jury charge error 'unless the error
appearing from the record was calculated to injure the rights of the defendant, or unless it appears
that the defendant has not had a fair and impartial trial.'"; finding "some harm" under Almanza to
objected-to jury charge error); see also Ngo v. State, 175 S.W.3d 738, 750-52 (Tex. Crim. App.
2005) (finding "egregious harm" under Almanza to unobjected-to constitutional error in jury
charge). As this Court stated in Jimenez v. State, 32 S.W.3d 233 (Tex. Crim. App. 2000):

 The question in this case is, what standard of harmless error applies to error in a
court's charge that was not objected to, and that is claimed to violate a
constitutional provision? We hold that the applicable standard is that provided by
article 36.19 of the Code of Criminal Procedure: "the judgment shall not be
reversed. . . unless it appears from the record that the defendant has not had a fair
and impartial trial."

Id. at 233. "A party is not excused from the procedural requirements for objecting at trial merely
because an error involves a constitutional right." Id. at 235. We explained that 

 to invoke the protection of this federal rule [of casting a burden on the State to
prove, beyond a reasonable doubt, that constitutional error was harmless under
Chapman v. California, 386 U.S. 18, 21 (1967)] in a state court, the appellant
must have complied with the state court's procedural rule for preserving and
presenting error. "'No procedural principle is more familiar to this Court than that
a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as
well as civil cases by the failure to make timely assertion of the right before a
tribunal having jurisdiction to determine it.'" If the right is forfeitable, as most
rights are, an appellant who did not comply with the rules for preserving and
presenting error must rely on the forum's rules for consideration of unpreserved
error.

Id. at 238 (footnote and citations omitted). 
39. The only exception was one juror (Mr. Zimmerman) who stated that he did not think
that evidence of a defendant's drug abuse or childhood poverty would mitigate a death sentence. 
However, he indicated that he could consider other mitigating evidence such as mental capacity. 
The court then questioned him further:

 And after you have heard everything, if you thought well, [the answer to special
question] one ought to be yes and [the answer to special question] two ought to be
yes, but I think based on this man's something, something in his past, something
about him, I don't think he ought to die, then you would be willing to go back and
change one of the answers to no to make sure he didn't die; is that right?

 The juror said that he would be able to do so. Defense counsel argued that the juror could
not consider mitigating evidence, and that his agreement with the questions posed by the court
and the State were "simply paying lip service to the idea of actually really giving fair
consideration to any mitigating circumstances in the case." When the trial court ruled that the
juror was qualified, applicant used his final peremptory challenge on him. The court's ruling was
within the bounds of reasonableness; furthermore, the juror was not empaneled, and therefore
applicant was not harmed by any potential prejudice caused by the juror's inability to consider a
poor childhood or drug addiction as mitigating evidence. 
40. Smith v. Texas, 543 U.S. at 48.
41. 686 S.W.2d at 174.
42. Applicant's position is that all Penry jury charge error is structural and thus immune
from any harmless error analysis. This position conflicts with well-established Texas law under
Almanza. It is inconsistent with our most recent decision in Penry v. State, 178 S.W.3d 782, 788
(Tex. Crim. App. 2005). It would appear that, under Supreme Court precedent as well, Penry
error is subject to review for harmless error. See Brown v. Payton, 125 S.Ct. 1432, 1452 (2005)
(Souter, J., dissenting) (disagreeing with plurality which found no Penry-type error; concluding
that the error was harmful under federal habeas standard set out in Brecht v. Abrahamson, 507
U.S. 619, 638 (1993)); see also Calderon v. Coleman, 525 U.S. 141, 144-46 (1998). 
43. Penry I, 492 U.S. at 323-24 ("Penry's mental retardation and history of abuse is thus a
two-edged sword: it may diminish his blameworthiness for his crime even as it indicates that
there is a probability that he will be dangerous in the future" because "one effect of his
retardation is his inability to learn from his mistakes").
44. Almanza, 686 S.W.2d at 172.